**SIGNED this 31st day of July, 2015**

*Shelley D. Rucker*

Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

In re:

VINCENT PERRY MORSE and                    No. 1:13-bk-13188-SDR
MARY LYNN MORSE,                           Chapter 7

       Debtors;

JARED SMITH

       Plaintiff,

v.

                                      Adversary Proceeding
                                      No. 1:13-ap-1117-SDR

VINCENT PERRY MORSE and
MARY LYNN MORSE,

       Defendants.

*Appearances for Jared Smith*

       Cara J. Alday
       Patrick, Beard, Schulman & Jacoway
       537 Market Street, Suite 202
       Chattanooga, TN 37402

*Appearances for the Debtors*

> Buddy B. Presley, Jr.
> Presley & Simonds
> 1612 Gunbarrel Road
> Suite 102
> Chattanooga, TN 37421

## MEMORANDUM

Plaintiff Jared Smith ("Plaintiff") has filed this adversary proceeding against defendant debtors Vincent Perry Morse and Mary Lynn Morse (collectively "Defendants" or "Debtors") seeking a judgment from this court that a debt in the amount of $100,000 is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6) and 11 U.S.C. §§ 727(a)(3), 727(a)(4)(A), and 727(a)(5). [Doc. No. 1, Complaint.][1] The Plaintiff further seeks interest and attorneys' fees.

This court has already ruled on a motion to dismiss filed by the Defendants. [Doc. No. 14; Doc. No. 15.] The court concluded that the Plaintiff adequately alleged the elements of his Section 523(a)(2)(A), 523(a)(4), 523(a)(6), 727(a)(3), 727(a)(4)(A), and 727(a)(5) claims against Mr. Morse. However, the court concluded that the Plaintiffs failed adequately to allege the elements of his Section 523(a)(2)(A), 523(a)(4), 523(a)(6), and 727(a)(4)(A) claim against Mrs. Morse. The court dismissed those claims against Mrs. Morse. The court concluded that the Plaintiff adequately alleged the elements of his Section 727(a)(3) and 727(a)(5) claim against Mrs. Morse.

The Defendants have now filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, as incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056. [Doc. No. 42.] The Plaintiff opposes the motion for summary judgment. [Doc. No. 53.]

---

[1] All docket entry references refer to docket entries for Adversary Proceeding 13-1117, unless otherwise noted.

The court has reviewed the briefing filed by the parties, the pleadings at issue, and the applicable law and concludes that it will deny the motion for summary judgment.

### I.     Background

Because the court is reviewing the Defendants' motion for summary judgment, the court must view the facts in the light most favorable to the Plaintiff.

The Debtors filed their Chapter 7 voluntary bankruptcy petition on June 28, 2013. [Bankr. Case No. 13-13188, Doc. No. 1.] The Debtors indicated on their petition that they were also doing business under the names "Deck Masters" and "North Chatt Enterprises." [*Id.* at 1.] Mr. Morse is the president and CEO of Deck Masters. [Doc. No. 42-1, Deposition of Vincent Perry Morse ("V. Morse Dep."), 15:4-8.] He is a 51% shareholder in Deck Masters. [*Id.* at 14:9-13.] The company was incorporated in 2002 as a remodeling and construction company specializing in decks, although Mr. Morse had worked for several years in the construction industry prior to incorporating Deck Masters. [*Id.* at 10-15.] Mr. Morse paid most of the bills and had the authority to write checks for the company; and he also worked to "raise capital" by pursuing "private investors." [*Id.* at 19-21.]

Mrs. Morse is the corporate secretary of Deck Masters. [Doc. No. 1-1, Ex. B.] She also admitted that she is a 49% shareholder. [Doc. No. 53, Ex. 1, Deposition of Mary Lynn Morse ("M. Morse Dep."), 11:25-12:2.] However, despite her role as corporate secretary, she has not maintained the minutes for any shareholder meetings, nor has she kept any records for Deck Masters. [*Id.* at 13:15-15:7.] She did not balance the Deck Masters' checkbook. [*Id.* at 17:11-20.] She did not keep track of vendor invoices either. [*Id.* at 18:5-7.] Nor did she keep track of how any construction funds were used by Deck Masters. [*Id.* at 19:18-22.]

The Plaintiff is a businessman who owns two car wash businesses in Chattanooga,
Tennessee and one car wash business in Winchester, Tennessee. [Doc. No. 42-2, Deposition of
Jared Smith ("Smith Dep.") 5:10-18.] He has owned car washes for about 12 years. [*Id.* at 5:21]
The Plaintiff testified that he had been interested in becoming involved in the construction
business for a number of years. [*Id.* at 9:8-11.] The Plaintiff met Mr. Morse when he frequented
the Plaintiff's car washes. [*Id.* at 20:10-12.] The Plaintiff understood that Mr. Morse was in the
construction business and began discussing it with him in 2009 or 2010. He claims that the
Debtor "was always talking about how well his company was doing and how well things were
going and encouraging me to get involved with his company." [*Id.* at 22:6-9.] The Debtor and
the Plaintiff went out to lunch or for a drink about five or six times in the summer of 2012. [*Id.* at
23:8-18.]

In his deposition the Plaintiff testified that he loaned $100,000 to Deck Masters. [*Id.* at
18:6-8.] He stated that he "transferred money from [his] different accounts into [his] personal
checking account and [he] wrote Vincent Morse a check." [*Id.* at 18:16-20.] There was a
problem with the personal check, so he provided the Debtor with two cashiers' checks dated
August 29, 2012, each made out to Deck Masters in the amount of $50,000. [*Id.* at 18:25-19:3.]
Attached as Exhibit A to the Complaint are copies of the two cashier's checks. [Doc. No. 1-1,
Ex. A.] The Plaintiff testified that it was his understanding that his money was to be used
exclusively for the purpose of building a new home at 902 Geswein Court. [Smith Dep. at 31:13-
15.] He further testified that the Debtor told him that it would cost $200,000 to build the home
and that the Debtor "would put up the rest of the money." [*Id.* at 61:16-22.] The Plaintiff
understood it to be a "50/50 deal." [*Id.* at 63:6-7.]

4

Exhibit B attached to the Complaint is a copy of an "Installment Note with Balloon

Payment" ("Note") dated August 29, 2012 in the amount of $100,000. [Doc. No. 1-1, Ex. B.]

The Note states in part that:

> FOR VALUE RECEIVED, the undersigned promises to pay to the order of
> JARED SMITH, the sum of ONE HUNDRED THOUSAND Dollars
> ($100,000.00), PLUS ONE-HALF (1/2) OF THE NET PROCEEDS OF THE
> SALE OF THE PROPERTY COMMONLY KNOWN AS 902 GESWEIN
> COURT, 37412. . . .
>
> The net proceeds (the sales price fro[m] the property minus expenses) of the sale
> shall be the amount of money due to the Seller on a settlement statement for the
> sale of the property. The settlement statement must be approved by Jared Smith or
> his assigns. Payment in full must be mailed to Jared Smith or his assigns within
> three business days of the closing. . . .
>
> If the said property has not been sold within 365 days of the execution of this
> note, then a balloon payment of $120,000.00 is immediately due and payable
> from the undersigned to Jared Smith or his assigns to satisfy this note in full.
>
> IT IS FURTHER AGREED that should any one of said installments remain due
> and unpaid for thirty (30) days, then the remaining installments of this note and
> interest may be treated as due and payable.
>
> NO DEED OF TRUST, MORTGAGE OR OTHER SECURITY INSTRUMENT
> IS BEING RECORDED TO SECURE THIS NOTE.
>
> THIS NOTE IS NOT ASSUMABLE WITHOUT WRITTEN PERMISSION OF
> THE NOTEHOLDER. THERE IS NO PREPAYMENT PENALTY.
>
> . . .
>
> In the event of default under the terms of this note, Interest will accrue to the
> maximum rate under applicable law.
>
> In the event payments are not received within fifteen (15) days of the due date, a
> late payment charge of five percent (5%) of principal and interest payment will be
> assessed.
>
> If this note is placed in the hands of an attorney for collection by suit or
> otherwise, or to protect the security for its payment We/I will pay all reasonable
> costs of collection and litigation, together with a reasonable attorney's fee.

[*Id.*] Both Debtors signed the Note in two different places, individually and on behalf of Deck

Masters.  [*See id.*] The Plaintiff understood that he did not have a "deed of trust, mortgage, or

other security instrument" "recorded to secure" the Note. [Smith Dep. at 33:18-24, 41:5-8.]

However, he contends that he was "assured that [his] money was in equity in that house." [*Id.* at

33:23-24.] The Plaintiff never "had any interest in investing" in Perry North, another of the

Defendant's projects. [*Id.* at 34:23-35:1.] Instead, the Defendant assured him "repeatedly that

[his] money was safe because it was equity in the house at 902 Geswein Court." [*Id.* at 38:1-3.]

The Plaintiff testified that he understood that the $100,000 he provided to the Defendant was a

loan and not an investment; he stated, "I consider an investment to have a risk. I consider a loan

as something that you're going to get your money back on. And [the Defendant] assured me that

I would get my money back." [*Id.* at 55:2-5.] The Defendant told the Plaintiff that the money

would be "used to build that specific house." [*Id.* at 61:11-12.] And the Defendant further

informed the Plaintiff that "[w]hatever the house sold for minus whatever it cost to build it, we

were going to split that in half." [*Id.* at 69:15-17.] Construction on the residence at 902 Geswein

Court was never completed. [*Id.* at 68:8-11.] The Plaintiff contends that the Defendant

deliberately lied to him about the fact that his $100,000 would be used solely for the purpose of

building the residence at 902 Geswein Court. [*Id.* at 80:2-8.]

Mr. Morse's version of events differs significantly from the Plaintiff's version. Mr.

Morse does not remember when he first met the Plaintiff but stated that he had been having his

car washed at the Plaintiff's car wash since 2004. [V. Morse Dep. at 208:9-18 .] He started

talking to the Plaintiff about his business around 2010. [*Id.* at 208:18-09:6.] Mr. Morse told the

Plaintiff "he might want to invest" in Mr. Morse's company as it was an "opportunity." [*Id.* at

56:6-12.] Mr. Morse explained, "I'm always seeking private investors. It's an opportunity laid

6

out. I don't solicit them. I don't press them. I just said, hey, I'm doing good. You know, you

guys want to get on board?" [*Id.* at 56:16-20.] Mr. Morse asserts that he informed the Plaintiff he

had an "investment opportunity." [*Id.* at 64:19-20.]

In summarizing his understanding of how he was to use the $100,000 he received from

the Plaintiff, Mr. Morse testified:

> . . . the money that came from [the Plaintiff] – I mean, listen, the money was a
> loan from Jared. You know, we talked for two years about, you know, how he
> wanted to go about getting into the business. He gave me a loan for $100,000. I
> told him that, you know, he would make a return on it and you can learn the
> business.
>     We never had a discussion at any time about that specifically being
> allocated for Lot 9. I mean, you know, we could go through this all day and I'm
> not trying to be difficult. I'm just telling you that at not any time that I told him
> that that money was going to be allocated for one house.

[*Id.* at 183:6-18.] He admits he used Mr. Smith's money "for everything, to pay bills" and also to

"[r]un the company." [*Id.* at 183:19-24.] Mr. Morse contends that he and the Plaintiff never

"discussed specifically the allocation of the money," but that the Plaintiff merely supplied a

"cash infusion" to Mr. Morse. [*Id.* at 99:23-100:1.] Mr. Morse's position is that his contract with

the Plaintiff provided that the payout the Plaintiff would receive was from profits associated with

902 Geswein Court. [*Id.* at 100:2-6.] He contends he informed the Plaintiff that he would use his

money "for the company to pay bills." [*Id.* at 107:12-13.] Mr. Morse accused the Plaintiff of

lying when the Plaintiff alleged that he spoke with Mr. Morse about using the $100,000 in funds

solely to construct the residence at 902 Geswein Court. [*Id.* at 107:22-08:5.] Mr. Morse notes

that he had Plaintiff "come on board" because Mr. Morse "always needed cash." [*Id.* at 123:19-

21.]

Mr. Morse admitted in his deposition that he transferred money back and forth from his

business bank accounts to his personal bank accounts and that he used the two accounts

interchangeably. [*Id.* at 199:11-200:1.] He could not identify where deposits and expenditures went and admitted that there was "no method to the madness." [*Id.*] Mr. Morse testified at length regarding how he used some of the Plaintiff's money to pay bills for his company, Deck Masters, Inc., and how his ledger does not detail expenses and income relating to each individual project. [*Id.* at 134:13-36:18.] Mr. Morse never checked to see if invoices detailed for which project the various vendors were billing his company; he merely "[t]hrew them in a box." [*Id.* at 150:16-51:2.]

In his deposition Mr. Morse reviewed his bank statements and testified regarding the use of at least some of the Plaintiff's funds. He indicated that on August 30, 2012 he withdrew $30,000 from the Deck Masters account into which he had deposited the $100,000 in cashier's checks from the Plaintiff and deposited the $30,000 into a personal account. [*Id.* and 132:9-14; *see also*, Doc. No. 42-4, Ex. 4, 891, 1149.] He used the $30,000 to pay various bills. [V. Morse Dep. at 132:15-17.] When asked how much of the bills related to the construction for 902 Geswein Court, Mr. Morse responded that he could not tell. [*Id.* at 133:17-18.] The statement provided in Exhibit 4 contains copies of cancelled checks with handwritten notations beside them, including such categories as "Perry Village Phase 2", "Painting 840 Dallas", "North Chatt Tax," and "Perry Run." Several checks appear to be made out to individuals, and other entities such as "EPB" and the Tennessee Department of Revenue. [Doc. No. 42-4, 1151-54]. When vendors came by Mr. Morse's office, he testified that "[t]hey said give me a couple of thousand. They got a couple thousand." [V. Morse Dep. at 135:7-9.] He concluded that "[i]t's just the way I operate. My vendors didn't have a problem with that." [*Id.* at 135:11-12.] He just paid vendors "on a tab." [*Id.* at 134:23-35:1.] He did not keep a separate ledger detailing the expenses relating to each separate project. [*Id.* at 136: 2-18.]

Exhibit 4 attached to the Defendants' motion for summary judgment contains a copy of a construction loan agreement and related documents for $172,000 borrowed by Deck Masters, Inc. from First Volunteer Bank, as well as the promissory note associated with the loan. [Doc. No. 42-4, 1175-207]. The construction loan agreement between the parties indicated that the funds from First Volunteer Bank were to be used solely for the construction of the residence at 902 Geswein Court. [*Id.* at 1175.] The Debtors were the guarantors on the loan. [*Id.* at 1180.] The promissory note, dated September 10, 2012, provided that the loan would be paid in full by September 10, 2013. [*Id.* at 1183.]

Mr. Morse further admits that the construction loan documents related to a construction loan from First Volunteer Bank in the amount of $172,000 for 902 Geswein Court and required the proceeds of the loan to be spent on that property. He acknowledged that he spent only some of the funds of the construction loan on building the residence at 902 Geswein Court. [V. Morse Dep. at 214:14-16:12.] First Volunteer Bank ultimately foreclosed on the property at 902 Geswein Court. [*Id.* at 217:7-10.] Mr. Morse has "no idea" how much money he had spent developing that property.

Mr. Morse "wanted to pull" the Plaintiff into providing him with a loan by "giving him as much information as we could" regarding the specific details of the proposed property at 902 Geswein Court. [*Id.* at 219:24-10:20.] Mr. Morse referred to the funds received from the Plaintiff on several occasions in his deposition as a "loan," and he instructed Mr. Ray Fox to create a contract evidencing that intention. [*Id.* at 221:21-22:17, 232:20-25.] He further agreed that his intention in obtaining the loan from the Plaintiff was to "pay bills" and for "cash flow, free up – pay up bills, free up vendors, move – move stuff in a faster direction." [*Id.* at 245:13-19.] He did not earmark any of the loan specifically for the 902 Geswein Court property. [*Id.* at 246:2.] He

9

believes that "some" of the money loaned by the Plaintiff to him was used to build the 902

Geswein Court residence. [*Id.* at 251:3-7.] Beyond asserting that he used the Plaintiff's funds to

"pay bills," Mr. Morse could not identify how the funds were allocated. [*See id*. at 152:1-55:14.]

The Defendants have provided 1,257 pages of financial records in support of their motion

for summary judgment. [Doc. No. 42-4.] However, they have not provided a ledger for the

residence at 902 Geswein Court that would help determine the expenses associated with that

construction project. Nor have the Defendants identified the pages out of the thousand plus pages

that help to support their motion for summary judgment. The first 225 pages are copies of the

General Ledger for North Chatt Enterprises, LLC for the year 2011 and dating to December 31,

2011. [*Id.* at 1-225.] The General Ledger includes two pages relating to expenses spent on 902

Geswein Court in 2011 in the total amount of $22,814.83. [*Id.* at 67-68.] The expenses include

amounts for such items as permits, surveys, subcontractors, construction utilities, and the cost of

the land. [*Id.*]

Exhibit 4 also includes a copy of the register for the Deck Masters First Volunteer

account indicating a deposit labeled "Loan Jared Smith" in the amount of $100,000 was made on

August 29, 2012. [*Id.* at 232.] The register also indicates that Mr. Morse made several payments

in the days immediately following his deposit of the $100,000 from the Plaintiff. Exhibit 4

indicates that on August 30, 2012, Mr. Morse withdrew $30,000 by cashier's check with a payee

of Deck Masters and Vincent Morse. [*Id.* at 233, 891.] The exhibit does not indicate the entire

memo, but states under memo "jareds loan cas. . . ." [*Id.*] A withdrawal of $31,000 was also

made on August 30, 2012 and paid to "Chicks Lumber" with a cashier's check. [*Id.*] On August

31, 2012 Case Concrete was paid $8,500 out of the First Volunteer Account also with a cashier's

check. [*Id.*] On September 3, 3012 two more withdrawals were made out to "Deck Masters Inc"

in the amounts of $2,000 and $8,500. [*Id.*] When asked to what projects the other cashier's checks pertained, Mr. Morse indicated that he did not know and that only the vendors themselves would know. [V. Morse Dep. at 149:10-50:6.]

On September 28, 2012, $10,000 was deposited in the First Volunteer Account and labeled "DDA Counter Deposit" relating to the construction loan at 902 Geswein Court. [Doc. No. 42-4, 234.] There appears to be another "DDA Counter Deposit" relating to 902 Geswein Court in the amount of $5,367.95 on October 29, 2012. [*Id.*] On November 2, 2012, $20,000 was withdrawn and labeled "Loan Jared Smith" and made out to "Deck Masters Inc." [*Id.*] It is unclear from the record and from Mr. Morse's deposition whether the withdrawals dating around the time of Plaintiff's provision of funds to Mr. Morse went to fund specific construction at 902 Geswein Court.

Exhibit 4 also includes a copy of the deposit slip relating to the $100,000 received from the Plaintiff and deposited into a First Volunteer Account. [*Id.* at 891, 909.] In handwriting to the right of the copy of the deposit slip, it states "Jared's Smith's Loan 50k 50k (100k) deposit". [*Id.* at 891.] The page also shows miscellaneous debit slips in the amount of $30,000 to Deck Masters Inc., in the form of a cashier's check. Exhibit 4 also shows a $31,000 withdrawal to Chicks Lumber and Basic Concrete and the $8,500 withdrawal to Case Concrete both in the form of cashier's checks. [*Id.*] Other pages pertaining to the First Volunteer Account bank statements refer to "Jared's Loan." [*See id*. at 898-99.] A "DDA Regular Deposit" of $20,000 into the First Volunteer Account on October 1, 2015 bears a notation on the bank statement of "Jared Smith's Loan." [*Id.* at 1114.]

Exhibit 4 further contains computer screenshots relating to the First Volunteer Bank construction loan for $172,000 with the handwritten notation of "902 Geswein Court" written on

11

it. [*Id.* at 1014.] The exhibit contains further screenshots indicating various dates of advances of principal on the $172,000 construction loan. [*See e.g.*, *id.* at 1014-24.] The records provided include handwritten notations relating to advances on the construction loan being deposited into Deck Master's First Volunteer Account. [*See id.*] A Notice of Final Payment from First Volunteer is dated August 23, 2013 with a due date of September 10, 2013 with a final payment amount of $171,969.93.

## II.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding.  The Plaintiff's action regarding the dischargeability of particular debts and objections to discharge is a core proceeding.  *See* 28 U.S.C. §§ 157(b)(2)(I), 157(b)(2)(J).

## III.    Standard of Review

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable to bankruptcy adversary proceedings. *See* Fed. R. Bank. P. 7056. Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Kava v. Peters*, No. 09-2327, 2011 WL 6091350, at *3 (6th Cir. Dec. 7, 2011).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

### IV.    Analysis

### A.    The Plaintiff's Section 523(a) Claims against Mr. Morse

11 U.S.C. § 727 provides for the discharge of an individual from any specific debt unless that debt is excepted from discharge pursuant to 11 U.S.C. § 523. 11 U.S.C. § 727(a)-(b). The creditor must prove by a preponderance of the evidence that its debt is non-dischargeable under 11 U.S.C. § 523. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659 (1991). Exceptions to discharge are narrowly construed in the debtor's favor. *See Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004).

### 1.    Section 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) prohibits discharges of debt based on "(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . ." The Sixth Circuit has held that to demonstrate nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A), a creditor must prove four elements:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2)

13

the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). A creditor bears the burden of demonstrating these elements by a preponderance of the evidence. *Id.* at 281 (relying on *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661).

An objection to dischargeability may be based on something broader than a specific statement by the debtor. In *In re Vitanovich*, the Sixth Circuit Bankruptcy Appellate Panel addressed the meaning of "actual fraud" within the context of § 523(a)(2)(A):

> We adopt the position of the Court of Appeals for the Seventh Circuit that actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.

*Mellon Bank v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)). The Sixth Circuit Bankruptcy Appellate Panel made clear that it finds that "actual fraud" is broader than a misrepresentation and encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *In re Vitanovich*, 259 B.R. at 877 (citing *McClellan*, 217 F.3d at 893). The Sixth Circuit Bankruptcy Appellate Panel further explained that:

> "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud."

*In re Vitanovich*, 259 B.R. at 877 (quoting *Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)) (other quotation omitted).

It is true, as the Plaintiffs assert, that "[a] finding of fraudulent intent may be made on the basis of circumstantial evidence, as direct proof of intent will rarely be available." *FIA Card Servs., N.A. v. Wagner (In re Wagner)*, No. 10-36900, 2012 WL 6737830 (Bankr. N.D. Ohio Dec. 28, 2012) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999)). However, "where a debtor's subjective intent is at issue, summary judgment is generally inappropriate unless all reasonable inferences defeat the claims of the opposing party." *Wagner*, 2012 WL 6737830 at *5.

In this proceeding the court concludes that genuine disputes of material fact exist regarding the Plaintiff's Section 523(a)(2)(A) claim against Mr. Morse. The Plaintiff has testified in his deposition that Mr. Morse convinced him to provide Deck Masters with a loan of $100,000 to build the specific house at 902 Geswein Court and not for any other purpose. Mr. Morse has testified that he disagrees with this assertion. For the purposes of summary judgment it does not matter that no other witnesses were privy to their conversation. This is a classic dispute of fact, and summary judgment is not appropriate where the parties dispute the material facts. These issues can only be resolved after a trial on the merits during which the factfinder will assess the credibility of each witness.

With respect to the second element of fraud, the intent to deceive, the Defendants deny any such intent and rely on absence of any of the representations about segregating the loan proceeds and using them only for the Geswein construction in the written agreement. They rely on the absence of any covenant not to place other liens on the property. The Plaintiffs rely on Mr. Morse's admissions in his deposition that he was giving the Plaintiff "as much information" as he could about the property at 902 Geswein Court. [V. Morse Dep. at 219:22-20:10.] He was also saying whatever it took to "pull" the Plaintiff in to providing the funds. [*Id.*] He asked Ray

Fox to draft the Note referencing the property and profits at 902 Geswein Court. [*Id.* at 221:21-22:17, 232:20-25.] The Plaintiff offers his testimony that there was more to the agreement than what was written in the installment note which does not contain a merger clause. There is further evidence that although he obtained a construction loan from First Volunteer Bank to build a residence at 902 Geswein Court and the loan documents provided that the loan proceeds would be used solely for that purpose, he did not use the loan proceeds solely for such purpose. [*Id.* at 214:14-16:9.] Mr. and Mrs. Morse admit that they cannot account for what was spent on the Geswein house. Thus, from these allegations the court finds that there is evidence that contradicts Mr. Morse's contention that he had no intention to deceive the Plaintiff. Viewing the evidence in the light most favorable to the Plaintiff, the court concludes that genuine disputes of material fact remain regarding the issue of intent to deceive.

The evidence further suggests disputes of fact exist regarding the Plaintiff's reasonable reliance on Mr. Morse. Mr. Morse admits to trying to convince the Plaintiff to provide him with the funds and admits he told the Plaintiff he "was doing good." [*Id.* at 56:6-21.] There is no evidence that Mr. Morse informed the Plaintiff at any time that he was experiencing any financial difficulties.

Finally, the Plaintiff contends he provided a loan to Mr. Morse in the amount of $100,000, and he has never been repaid. Mr. Morse refers to the transaction as an investment in the company. There are therefore disputes of fact remaining regarding whether the Plaintiff suffered damages from Mr. Morse's allegedly fraudulent scheme to obtain money from the Plaintiff. The Defendants' summary judgment motion regarding the Section 523(a)(2)(A) claim against Mr. Morse will be denied.

## 2.    Non-dischargeability Pursuant to 523(a)(4)

16

11 U.S.C. § 523(a)(4) states in relevant part: "A discharge under section . . . 727 of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . ." 11 U.S.C. § 523(a)(4).  Federal common law will determine the meaning of the terms in Section 523(a)(4).  *See SmithKline Beecham Corp. v. Lam (In re Lam)*, No. 06-68805-MGD, 2008 WL 7842072, at *3 (Bankr. N.D. Ga. Mar. 27, 2008) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901 (7th Cir. 1991); *In re Wallace*, 840 F.2d 762 (10th Cir. 1988)) (other citations omitted).  The creditor must prove by a preponderance of the evidence that a debt is nondischargeable under 11 U.S.C. § 523.  *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659 (1991).

The Sixth Circuit has explained that:

> [f]ederal law defines "embezzlement" under section 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996), *abrogated on other grounds as explained in National Devel. Servs. v. Denbleyker (In re Denbleyker)*, 251 B.R. 891 (Bankr. D. Colo. 2000) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982) and *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295 (1895)) and (citing *Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)). To demonstrate embezzlement a creditor must prove all three elements: "(1) 'that he entrusted his property to the debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) that 'the circumstances indicate fraud.'" *Cash America Fin.*

17

*Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007) (quoting *In re Brady*,

101 F.3d at 1173). With respect to the third element, the Sixth Circuit has noted:

> The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude
> or *intentional* wrong." Accordingly, embezzlement claims under § 523(a)(4)
> require "proof of the debtor's fraudulent intent in taking the [creditor's] property."
> As the *Brady* definition suggests, the debtor's fraudulent intent may often be
> shown by circumstantial evidence.

*In re Fox*, 370 B.R. at 116 (quotations and citations omitted). Circumstantial evidence of fraud is

sufficient, but the court must have some evidence of the deceit or scheme to find fraudulent

intent. *In re Fox*, 370 B.R. at 116-17. In *In re Fox* the 6th Circuit Bankruptcy Appellate Panel

provided helpful guidance regarding the analysis of what is required to prove fraudulent intent

for purposes of embezzlement under 11 U.S.C. § 523(a)(4):

> By requiring the Appellant to prove the elements of misrepresentational fraud in
> support of its embezzlement claim, the bankruptcy court imposed an overly
> restrictive definition of "circumstances indicating fraud."  Fraud comes in many
> sizes, shapes, and shades of gray.  In other contexts, courts have defined "fraud"
> as "encompass[ing] 'any deceit, artifice, trick, or design involving direct and
> active operation of the mind, used to circumvent and cheat another.'"  Under this
> broad definition, a creditor may establish circumstances indicating a debtor's
> fraudulent intent, even if the debtor did not make a misrepresentation or
> misleading omission on which the creditor relied.
>
> This is not to say that a debtor's misrepresentations or omissions are irrelevant to
> the embezzlement analysis. To the contrary, misrepresentations, omissions, or
> other concealment of a debtor's actions regarding a creditor's property are
> important circumstances that might pierce the shadows to illuminate a debtor's
> fraudulent intent.
>
> On the other hand, a debtor's fraudulent intent might be negated by circumstantial
> evidence showing "that the debtor used [the creditor's property] openly, without
> attempting to conceal, and had reasonable grounds to believe he had the right to
> so use."

*Id.* (quoting *In re Vitanovich*, 259 B.R. at 877 and *In re Weber*, 892 F.2d 534 (7th Cir. 1989),

*abrogated on other grounds by Grogan*, 498 U.S. 279, 111 S.Ct. 654) (other quotations and

citations omitted).

The court concludes that genuine disputes of material fact exist regarding the Plaintiff's

embezzlement claim under Section 523(a)(4) against Mr. Morse. Although there is no dispute

that the Plaintiff provided $100,000 in the form of two cashier's checks payable to Deck

Masters, the parties had very different views on what Mr. Morse was entitled to do with those

funds. The Plaintiff has testified under oath that he discussed that the funds were entrusted to the

Defendant Mr. Morse to construct a residence at 902 Geswein Court. The evidence provided in

the form of financial records and Mr. Morse's testimony demonstrates that instead, Mr. Morse,

through Deck Masters, transferred the funds to himself for personal expenses and authorized

Deck Masters to use the funds to pay pre-existing debts unrelated to the Geswein Property. The

Plaintiff has testified at his deposition that Mr. Morse misrepresented to the Plaintiff the purpose

of the loan and that he never intended to use the Plaintiff's funds for the construction at Geswein

Court. The evidence also indicates that Mr. Morse obtained a construction loan from First

Volunteer Bank for Geswein Court only days after obtaining the Plaintiff's money even though

he assured the Plaintiff that he would build the residence without obtaining a loan. Mr. Morse

takes the position that Deck Masters was given the money as an investment and in exchange for

Mr. Morse providing instruction on how to build houses to Mr. Smith. The court concludes that

genuine disputes of material fact exist regarding the Plaintiff's Section 523(a)(4) embezzlement

claim. The Defendants' motion for summary judgment on this claim will be denied.

**3.     Section 523(a)(6)**

11 U.S.C. § 523(a)(6) states in relevant part:

> A discharge under section 727. . . of this title does not discharge an individual debtor from any debt. . .
>
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

11 U.S.C. § 523(a)(6).

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by analyzing federal law. *See, e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01 (Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388 (Bankr. N.D. Ohio 1999)). 11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and* malicious is nondischargeable. *See* 11 U.S.C. § 523(a)(6). "[T]he judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). The U.S. Supreme Court has addressed the meaning of "willful" within the context of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998). As summarized by the Sixth Circuit:

> [t]he Court held that "willful" means "voluntary," "intentional," or "deliberate." As such, only acts done with the intent to cause injury – and not merely acts done intentionally – can cause willful and malicious injury. The Court explained its holding by discussing the importance of context:
>
> > The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts

20

> generally require that the actor intend "the *consequences* of an
> act," not simply "the act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless
'the actor desires to cause consequences of his act, or . . . believes that the consequences are
substantially certain to result from it,' he has not committed a 'willful and malicious injury' as
defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464. Proof of willful behavior must
often be demonstrated through the use of circumstantial evidence. *See In re Jones*, 276 B.R. at
802. The bankruptcy court in *In re Jones* noted that "willful" behavior can "be indirectly
established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the
creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those
rights." *Id.*

As to the element of malice, a malicious injury occurs "when a person acts in conscious
disregard of their duties or without just cause or excuse." *In re Jones*, 276 B.R. at 803 (citing
*Gonzalez v. Moffitt (In re Moffitt),* 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)). A finding of
maliciousness does not require a determination of ill-will or specific intent. *See In re Trantham*,
304 B.R. at 308. However, malice requires the finding of a level of conduct beyond negligent or
reckless behavior. *West Michigan Community Bank v. Wierenga (In re Wierenga)*, 431 B.R. 180,
185 (Bankr. W.D. Mich. 2010) (citation omitted); *see also, JP Morgan Chase Bank, NA v. Algire
(In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010); *Geiger*, 523 U.S. at 64, 118 S.Ct.
974. A creditor may prove the element of maliciousness by demonstrating that "(1) the debtor
has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act
necessarily causes injury, and (4) there is no just cause or excuse for the action." *In re Algire*,

21

430 B.R. at 823 (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991),

*abrogated on other grounds by Geiger*, 523 U.S. 57).

In *National Sign and Signal v. Livingston* the district court explained that the § 523(a)(6)

exception applies where the injury invades a creditor's legal rights. 422 B.R. 645, 653 (W.D.

Mich. 2009) (citing *Steier v. Best (In re Best)*, 109 F. App'x 1, 6 (6th Cir. 2004)). The district

court quoted the Sixth Circuit decision in *In re Best* noting:

> Section 523(a)(6)'s term "willful . . . means deliberate or intentional invasion of
> the legal rights of another, because the word 'injury' usually connotes legal injury
> (*injuria*) in the technical sense, not simply harm to a person." The conduct "must
> be more culpable than that which is in reckless disregard of creditors' economic
> interests and expectancies, as distinguished from . . . legal rights. Moreover,
> knowledge that legal rights are being violated is insufficient to establish
> malice . . . ."

*Livingston*, 422 B.R. at 653 (quoting *In re Best*, 109 F. App'x at 6). The court in *Livingston*

noted that there are three elements that a creditor must demonstrate to state a claim under §

523(a)(6): "(1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its

legal rights or to the legal rights to its property, and (3) the invasion was caused by the debtor's

conduct." 422 B.R. at 653 (citing *CMEA Title Agency v. Little (In re Little)*, 335 B.R. 376, 383

(Bankr. N.D. Ohio 2005)).

In this case the court concludes that genuine disputes of material fact exist regarding the

elements of the Plaintiff's Section 523(a)(6) claim against Mr. Morse. The Plaintiff contends that

Mr. Morse intentionally deceived him regarding the purpose of the $100,000 funds. Instead of

using the money to build the property at Geswein Court, Mr. Morse admits that he used the

$100,000 to pay for pre-existing debts. The Plaintiff alleges Mr. Morse was without just cause or

excuse to use the $100,000 for purposes other than those outlined in the Note and that the

Plaintiff suffered injury in the form of a loss of his $100,000. These allegations, supported by his

22

deposition testimony, are sufficient to satisfy the elements of Section 523(a)(6). The defendant

focuses on the Note and contends that Deck Masters Inc. was the payee and the language in the

document states the parties' understanding of the transaction. The court finds that disputes exist

as to whether the identification of the property in the Note was a willful and deliberate attempt to

mislead the plaintiff and cause harm. The court denies the Defendants' motion for summary

judgment on the Plaintiff's Section 523(a)(6) claim.

### B.      The Plaintiff's Section 727 Denial of Discharge Claims

11 U.S.C. § 727 provides that a debtor shall receive a discharge of all his debts, except in

certain limited circumstances. The Plaintiff asserts that several of those exceptions to the right of

discharge apply to the Debtor. A plaintiff must prove the elements of 11 U.S.C. § 727(a) by a

preponderance of the evidence, and courts generally construe Section 727(a) liberally in favor of

the debtor. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *see also, Roberts*

*v. Oliver (In re Oliver)*, 414 B.R. 361, 373 (Bankr. E.D. Tenn. 2009).

### 1.      Section 727(a)(3)

11 U.S.C. § 727(a)(3) precludes a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of the
> circumstances of the case.

11 U.S.C. § 727(a)(3).

Although exceptions to discharge are narrowly construed in the debtor's favor, " '[b]road

discretion is vested in the referee to grant or deny a bankruptcy petition based on a determination

that books or records are adequate under the terms of the statute and the facts of each case. . . .' "

*Dolin v. Northern Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986) (quoting

*McBee v. Sliman*, 512 F.2d 504, 506 (5th Cir. 1975)); *see also In re Trantham*, 304 B.R. at 306;

*CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007)

("statute is to be liberally construed in favor of the Debtor").

Courts in this Circuit have interpreted 11 U.S.C. § 727(a)(3) "to apply a shifting burden

of proof":

> The Plaintiff must establish a *prima facie* case showing the Debtor failed
> to keep adequate records. For purposes of § 727(a)(3), the Plaintiff is not entitled
> to perfect, or even necessarily complete, records. Instead, the Debtor must provide
> the Plaintiff "with enough information to ascertain the debtor's financial condition
> and track his financial dealings with substantial completeness and accuracy for a
> reasonable period past to present." In determining the adequacy of records, the
> court can consider the Debtor's education, business experience, sophistication, or
> any other relevant factor.

> If the Plaintiff has established this *prima facie* case, the burden then shifts
> to the Debtor to explain why the failure to keep records, under the circumstances
> of the case, is justified. In considering an explanation, the court should consider
> both the Debtor's credibility and the reasonableness of the explanation,
> considering the debtor's sophistication and the materiality of the records. The
> requirement for keeping recorded information is not an unqualified one and
> complete disclosure is not always required, but instead it is a question of
> reasonableness under the circumstances. However, if disclosure cannot be made
> without the keeping of recorded information, the failure to supply the records is
> relevant to the policy underlying § 727(a)(3).

> The ultimate burden of persuasion, of course, rests with the Plaintiff. The
> standard of proof for discharge objections under § 727(a) is by a preponderance of
> the evidence.

*CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415-16 (Bankr. S.D. Ohio

2007) (quoting *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (B.A.P. 6th Cir.

1999)) (other citations omitted). In addition, " '[t]he adequacy of debtor's records must be

determined on a case by case basis. Considerations to make this determination include debtor's

occupation, financial structure, education, experience, sophistication and any other

circumstances that should be considered in the interest of justice.' " *In re Strbac*, 235 B.R. at 882

(quoting *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)).

Further, "intent is not an element under § 727(a)(3)." *See Hendon v. Lufkin (In re Lufkin)*, 393

B.R. 585, 593 (Bankr. E.D. Tenn. 2008). Bankruptcy courts in this Circuit have created a

standard for assessing the adequacy of recordkeeping that recommends that "the Debtor's

records should be measured 'against the type of books and records kept by a reasonably prudent

debtor with the same occupation, financial structure, education, and experience.'" *Ayers v. Babb

(In re Babb)*, 358 B.R. 343, 354 (Bankr. E.D. Tenn. 2006) (quoting *Wazeter v. Michigan Nat'l

Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997) (internal quotation omitted)).

### a.    Section 727(a)(3) Claim Against Mr. Morse

In support of this claim, the Plaintiff contends that Mr. Morse has been unable to

articulate how he spent the $100,000 provided to him by the Plaintiff. The evidence demonstrates

that Mr. Morse provided himself with a $30,000 cashier's check immediately following the

deposit of Plaintiff's funds, but that he is unable to explain how he spent that money. [*See* Doc.

No. 42-4, 909, 1149; V. Morse Dep. at 132:9-36:12.] Further, Mr. Morse admitted in his

deposition that he cannot trace how he spent the Plaintiff's funds, but simply asserts that they

went to "pay bills." [V. Morse Dep. at 132:9-36:12.]

Mr. Morse was a businessman who owned a construction business and who developed

property. It appears from Mr. Morse's deposition that he was quite successful in his business

initially. He testified that "at the time we were selling a lot of houses." [*Id.* at 57:4-5.] Mr. Morse

indicated that he does not have records that indicate how funds were allocated on the various

properties he was developing and that he just threw invoices into a box without examining to

which project they related. [*Id.* at 150:16-51:2.] Despite this level of record keeping for himself

and Deck Masters, he signed a note which required him to repay one half of the "net proceeds (the sales price fro(sic) the property minus expenses)" from the sale of the Geswein property to Mr. Smith as his partner. [Doc. No. 1-1, Ex. B.] To comply with such a contract would have required Mr. Morse to maintain a separate accounting for at least that construction project. Given the evidence provided in the record and reviewing the facts in the light most favorable to the Plaintiff, the court concludes that genuine disputes of material fact exist regarding whether Mr. Morse failed to keep adequate records regarding how he disposed of the Plaintiff's $100,000 or to account for the construction of the Geswein property. A distribution totaling $30,000 was made from Deck Masters to Mr. Morse by cashier's check shortly after the Plaintiff's funds were deposited into Mr. Morse's personal Gateway Bank account for which no explanation has been provided. Mr. and Mrs. Morse were officers and the sole shareholders of Deck Masters.

The court notes that although the Defendants have provided the court with over 1,200 pages of financial records, these records are not organized in any way that would be helpful to determine exactly how the Plaintiff's $100,000 was spent. [*See* Doc. No. 42-4.] The Defendant admits even he cannot explain what happened to the money. The Defendant's summary judgment regarding the Plaintiff's Section 727(a)(3) claim against Mr. Morse will be denied.

### b.    Section 727(a)(3) Claim Against Mrs. Morse

The court concludes that genuine disputes of material fact exist regarding the Section 727(a)(3) claim against Mrs. Morse. The Note reflects that Mrs. Morse is the corporate secretary of Deck Masters. [Doc. No. 1-1, Ex. B.] She has also admitted that she is a 49% shareholder in her deposition. [M. Morse Dep. at 11:25- 12:2.] She has not maintained the minutes for any shareholder meetings in her role as secretary. [*Id.* at 13:24-14:4.] She has also not kept any records for Deck Masters. [*Id.* at 15:4-7.] She did not balance the Deck Masters checkbook. [*Id.*

at 17:11-17.] She did not keep track of vendor invoices either. [*Id.* at 18:5-8.] Mrs. Morse did not

trace how any construction funds were used by Deck Masters. [*Id.* at 19:18-22.] Mrs. Morse has

admitted that she does not know what happened to the Plaintiff's $100,000. [*Id.* at 27:23-28:2.]

She thinks Mr. Morse may have used the money to pay bills, but she is not sure. [*Id.* at 30:15-

19.] As the secretary of Deck Masters and a 49% shareholder in a construction business, the

court finds that there is a question of fact whether she kept adequate records when measured

against a reasonably prudent debtor with the same occupation, financial structure, education, and

experience. *Ayers*, 358 BR at 354. The question of the adequacy of her records is especially true

for a business that entered into note obligations calculated by a percentage of the profits. [V.

Morse Dep. at 74:3-20] Therefore, the court concludes that genuine disputes of fact exist

regarding the Plaintiff's Section 727(a)(3) claim against Mrs. Morse.

## 2.    Non-Dischargeability Pursuant to 11 U.S.C. § 727(a)(4)(A)

The Bankruptcy Code provides that a debtor shall receive a discharge from the court

unless "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a

false oath or account. . . ." 11 U.S.C. § 727(a)(4)(A). Courts in this Circuit have determined that

to state a claim pursuant to § 727(a)(4)(A), a plaintiff must demonstrate by a preponderance of

the evidence the following five elements:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the
> debtor knew the statement was false; (4) the debtor made the statement with
> fraudulent intent; and (5) that the statement related materially to the bankruptcy
> case.

*Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 903 (Bankr. W.D. Tenn. 2009) (citing *In re

Keeney*, 227 F.3d at 685).

Statements made by a debtor in his bankruptcy schedules, his personal statement of

financial affairs, and at 341 meetings are all statements made under oath. *Noland v. Johnson (In*

27

*re Johnson*), 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) (citing *Hamo v. Wilson (In re Hamo)*,

233 B.R. 718, 725 (B.A.P. 6th Cir. 1999)) (other citations omitted). Whether a false statement

under oath has been made pursuant to 11 U.S.C. § 727(a)(4)(A) is a question of fact. *In re*

*Jarrett*, 417 B.R. at 903. In *In re Hamo*, the Bankruptcy Appellate Panel for the Sixth Circuit

quoted a bankruptcy court regarding the purpose of § 727(a)(4)(A):

> The very purpose of . . . 11 U.S.C. § 727(a)(4)(A), is to make certain that those
> who seek the shelter of the bankruptcy code do not play fast and loose with their
> assets or with the reality of their affairs. The statutes are designed to insure that
> complete, truthful, and reliable information is put forward at the outset of the
> proceedings, so that decisions can be made by the parties in interest based on fact
> rather than fiction . . . . Neither the trustee nor the creditors should be required to
> engage in a laborious tug-of-war to drag the simple truth into the glare of
> daylight.
> . . . .
>
> A discharge is a privilege and not a right and therefore the strict requirement of
> accuracy is a small quid pro quo. The successful functioning of the bankruptcy
> code hinges upon the bankrupt's veracity and his willingness to make a full
> disclosure.

233 B.R. at 725-726 (quoting *Hillis v. Martin, Martin v. Martin (In re Martin)*, 124 B.R. 542,

545, 547-48 (Bankr. N.D. Ind. 1991)).

The Sixth Circuit explained in *In re Keeney* how courts should analyze section

727(a)(4)(A) claims:

> 'Complete financial disclosure' is a prerequisite to the privilege of discharge.  The
> Court of Appeals for the Seventh Circuit has explained that intent to defraud
> 'involves a material representation that you know to be false, or, what amounts to
> the same thing, an omission that you know will create an erroneous impression.'
> A reckless disregard as to whether a representation is true will also satisfy the
> intent requirement. '[C]ourts may deduce fraudulent intent from all the facts and
> circumstances of a case.' However, a debtor is entitled to discharge if false
> information is the result of mistake or inadvertence. The subject of a false oath is
> material if it 'bears a relationship to the bankrupt's business transactions or estate,

28

or concerns the discovery of assets, business dealings, or the existence and
disposition of his property.'

227 F.3d at 685-86 (citing *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)) (quoting *Williamson
v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987); *Beaubouef v. Beaubouef (In re
Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).

Mr. Morse has stated that he believes the $100,000 was a cash infusion in the company
rather than a loan associated with construction at 902 Geswein Court in the company under oath
in his deposition. [Morse Dep., 99:23-100:15.] The Plaintiff contends that Mr. Morse made a
false statement regarding the purpose of the $100,000 loan, under oath in his Section 341
meeting, the Defendant knew the statement was false when he made it based on the Note, the
statement was made with fraudulent intent to obscure the purpose of the loan, and it related
materially to the bankruptcy. The court concludes that genuine disputes of material fact exist
regarding the Plaintiff's Section 727(a)(4)(A) claim against Mr. Morse, and the Defendants'
motion for summary judgment on this claim against Mr. Morse will therefore be denied.

### 3.    Section 727(a)(5)

Section 727(a)(5) allows a court to deny a discharge where "the debtor has failed to
explain satisfactorily, before determination of denial of discharge under this paragraph, any loss
of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). With
respect to a Section 727(a)(5) claim:

[t]he initial burden is on the Plaintiff to establish the loss or deficiency of assets
by demonstrating that (1) at a time not too remote from the bankruptcy, the
Defendant owned identifiable assets; (2) on the day that he commenced his
bankruptcy case, the Defendant no longer owned the particular assets in question;
and (3) his schedules and/or the pleadings in the bankruptcy case do not offer an
adequate explanation for the disposition of the assets in question. The Plaintiff is
not required to prove that the Defendant acted knowingly or fraudulently, as

"noticeably lacking from § 727(a)(5) is any element of wrongful intent or, for that matter, any affirmative defenses-- § 727(a)(5) simply imposes strict liability."

*Roberts v. Debusk (In re Debusk)*, No. 08-3015, 2008 WL 3904448, at *8 (Bankr. E.D. Tenn. Aug. 19, 2008) (citing *Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 279 (Bankr. W.D. Ky. 1999) and quoting *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004)).

### a.   Section 727(a)(5) Claim Against Mr. Morse

As noted *supra* with respect to his Section 727(a)(3) claim, the Plaintiff has alleged that Mr. Morse had $100,000 before he filed bankruptcy which he received as the proceeds of the Smith loan/investment. The money was gone when the case was filed and there was no equity in 902 Geswein. Mr. Morse stated in his deposition that he cannot explain what happened to the Plaintiff's funds or how his other resources were allocated. [V. Morse Dep., 134:13-36:12.] In addition, as noted *supra*, despite providing the court with over 1,200 pages of financial records, Mr. Morse has yet to explain how he disposed of the loan/investment proceeds. Mr. and Mrs. Morse seem to be saying the explanation is contained somewhere in the 1,200 pages of documents. The court concludes that genuine disputes of material fact exist regarding the Plaintiff's Section 727(a)(5) claim against Mr. Morse. Defendants' motion for summary judgment on the Plaintiff's Section 727(a)(5) claim against Mr. Morse will be denied.

### b.   Section 727(a)(5) Claim Against Mrs. Morse

With respect to the Section 727(a)(5) claim against Mrs. Morse, the court notes she has admitted to being the secretary and a 49% shareholder of Deck Masters. [M. Morse Dep. at 11:25-12:8.] She does not know how the Plaintiff's funds were spent, nor did she know how Mr. Morse spent Deck Masters' funds. [*Id.*] She also signed the Note. [Doc. No. 1-1, Ex. B.] At least $30,000 of the Plaintiff's funds went to Mr. Morse in the form of a cashier's check. Mr. Morse deposited the funds into a personal bank account held jointly with his wife. [V. Morse Dep. at

132:9-14.] To the extent that Mrs. Morse came into possession of these funds, the Plaintiff relies on her statement that she does not know how the funds were spent to support his claim. Mrs. Morse countered that claim by offering all of her personal bank statements to explain the expenditure of the funds. But she does not specify which statement provides the explanation. The court finds the parties explanations contradictory and that a genuine issue as to a material fact exists. The Defendants' motion for summary judgment on its Section 727(a)(5) claim against Mrs. Morse will be denied.

### V.        Conclusion

As explained *supra*, the court has determined that it will deny the Defendants' motion for summary judgment.

The court concludes that genuine disputes of material fact exist regarding the Plaintiff's Section 523(a)(2)(A), 523(a)(4), 523(a)(6), 727(a)(3), 727(a)(4)(A), and 727(a)(5) claims against Mr. Morse. The Defendants' motion for summary judgment regarding these claims against Mr. Morse will be denied.

The court concludes that genuine disputes of material fact exist regarding the Plaintiff's Section 727(a)(3) and 727(a)(5) claims against Mrs. Morse. The court will therefore deny Defendants' motion for summary judgment regarding these claims against Mrs. Morse.

A separate order will enter.

# # #