**SIGNED this 24th day of May, 2016**

*Shelley D. Rucker*
_____
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

In re:

VINCENT PERRY MORSE and                    No. 1:13-bk-13188-SDR
MARY LYNN MORSE,                             Chapter 7

       Debtors;

JARED SMITH

       Plaintiff,

v.

                                    Adversary Proceeding
                                    No. 1:13-ap-1117-SDR

VINCENT PERRY MORSE and
MARY LYNN MORSE,

       Defendants.

*Appearances for Jared Smith*

       Cara J. Alday
       Susie Lodico
       Patrick, Beard, Schulman & Jacoway
       537 Market Street, Suite 202
       Chattanooga, TN 37402

*Appearances for the Debtors*

> Buddy B. Presley, Jr.
> Presley Law Firm
> 1384 Gunbarrel Road, Suite B
> Chattanooga, TN 37421

## TRIAL MEMORANDUM

Plaintiff Jared Smith ("Plaintiff" or "Smith") has filed this adversary proceeding against defendant debtors Vincent Perry Morse ("Morse") and Mary Lynn Morse ("Mrs. Morse") (collectively "Defendants" or "Debtors") seeking a judgment from this court that a debt in the amount of $100,000 owed by the Debtors jointly is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). He also seeks denial of both Debtors' discharges under 11 U.S.C. §§ 727(a)(3), 727(a)(4)(A), and 727(a)(5).[1] (Doc. No. 1, Complaint.)[2] The Plaintiff further seeks interest and attorneys' fees. The court finds that Morse has an obligation to pay the Plaintiff $100,000 plus attorney's fees and that this debt is not dischargeable. The amount of attorney's fees will be determined at a hearing to be set by separate order.

### I.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district, provide this court with jurisdiction to hear and decide this adversary proceeding. The Plaintiff's action regarding the dischargeability of particular debts and objections to discharge is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I), (J).

---

[1] This court has already ruled on a motion to dismiss filed by the Defendants. (Doc. No. 14; Doc. No. 15.) The court concluded that the Plaintiff adequately alleged the elements of his Section 523(a)(2)(A), 523(a)(4), 523(a)(6), 727(a)(3), 727(a)(4)(A), and 727(a)(5) claims against Mr. Morse. However, the court concluded that the Plaintiff failed to adequately allege the elements of his Section 523(a)(2)(A), 523(a)(4), 523(a)(6), and 727(a)(4)(A) claims against Mrs. Morse. The court dismissed those claims against Mrs. Morse. The court concluded that the Plaintiff adequately alleged the elements of his Section 727(a)(3) and 727(a)(5) claims against Mrs. Morse.

[2] All docket entry references refer to docket entries for Adversary Proceeding 13-1117, unless otherwise noted.

## II.    Facts

### A. The Parties

The Debtors filed their Chapter 7 voluntary bankruptcy petition on June 28, 2013.

(Bankr. Case No. 13-13188, Doc. No. 1.) The Debtors indicated on their petition that they were

also doing business under the names "Deck Masters" and "North Chatt Enterprises." (*Id.* at 1.)

Morse is the president and CEO of Deck Masters. (Testimony of Vincent Morse, November 9,

2015, 1:58:32 ("V. Morse Test.")) Deck Masters, Inc. was incorporated in 2002 as a remodeling

and construction company specializing in decks, although Morse had worked for several years in

the construction industry prior to incorporating Deck Masters. (*Id.*)  He is a 51% shareholder in

Deck Masters.  (*Id.*) Morse paid most of the bills and had the authority to write checks for Deck

Masters.  He also worked to "raise capital" by pursuing "private investors." (*Id.*)  Morse used

accounts in the name of Deck Masters, Inc. and his own name interchangeably. (*Id.* at 3:47:34.)

Mrs. Morse is the corporate secretary of Deck Masters, Inc. (Doc. No. 1-1, Ex. B.)  She

testified that she is a 49% shareholder. (Testimony of Mary Lynn Morse, November 9, 2015,

1:27:19 ("M. Morse Test."))  However, despite her role as corporate secretary, she has not

maintained the minutes for any shareholder meetings, nor has she kept any records for Deck

Masters. (*Id.*)  She was not on the Deck Masters account. (*Id.* at 1:30:23.)  She did not balance

the Deck Masters checkbook. (*Id.*)  She did not keep track of vendor invoices (*Id.* at 1:47:36),

nor did she keep track of how any construction funds were used by Deck Masters. (*Id.* at

1:29:43.)  She did, however, sign documents as a corporate officer or guarantor for the

company's projects when Morse asked. (*Id.* at 1:36:54.) Morse testified that the corporate

records for Deck Masters are unavailable due to the death of his accountant in 2012. (V. Morse

Test., November 9, 2015, 2:01:57.)

The Plaintiff, Smith, owns two car wash businesses in Chattanooga, Tennessee, and one car wash business in Winchester, Tennessee. (Testimony of Jared Smith, November 9, 2016, 9:38:24 ("Smith Test.")) He has owned car washes for about 13 years. (*Id.*) He met Morse in 2004 when Morse frequented the Plaintiff's car washes. (*Id.* at 9:39:11.) He testified that he had been interested in the construction business from conversations with Morse in 2008-9. (*Id.* at 9:42:55.)

### B. The "Investment"

Smith understood that Morse was in the construction business and began discussing his interest in the business with him in 2009 or 2010. (*Id.* at 9:42:55.) Morse and Smith went out to lunch or for a drink several times in the summer of 2012 to discuss a business relationship. (*Id.* at 9:43:08-46:28.)

In the summer of 2012, Morse and Smith began discussing specific projects. (Smith Test., November 9, 2015, 9:43:08.) Morse was building in East Ridge in a development referred to as Perry Village but talked to Smith about getting involved in a new project near downtown Chattanooga called Perry North. (*Id.* at 9:43:22-56.) Morse encouraged Smith to invest $100,000 in the Perry North project. (*Id.* at 9:45:55.) Morse entertained Smith at several meetings, lunches, drinks, and a cookout where he continued to promote the Perry North project. During this time Morse repeatedly told him that "things were going really well." (*Id.* at 9:47:40.)

Morse also began sending Smith documents for loans to Deck Masters and for the Perry North project. On July 16, 2012, Morse sent Smith an email with a deed of trust and a note payable by Deck Masters and the Morses to Smith for $100,000. The note was to be secured by a lien on seven tracts of property in the Perry North subdivision. (Trial Ex. 5.) The note allowed Morse to transfer two of the lots to Smith in full satisfaction of the note obligation in the eleventh

month if the transfer was acceptable to both of them. (Tr. Ex. 5 at 7; Smith Test., November 9,

2015, 9:55:55.)  The note was to be signed by Deck Masters and by Mr. and Mrs. Morse

individually. (Tr. Ex. 5 at 8.)

Smith told Morse that he was not sure about investing in Perry North, but Morse

continued to pursue him for the investment every few days. (Smith Test., November 9, 2015,

9:57:54.)  On July 30, 2012, Morse sent an email to Smith which stated:

> Well things are happening fast my friend! I believe the banks are smelling a
> buyers[sic] market again which allows them to loosen the purse strings! I'm
> sending you the bank commitments and this will allow you to see I'm a great
> candidate for investment. Here is the loan commitment from both banks! Your
> investment would be the last one to put us over the top!! I'm so excited and I
> would love for you to experience the fruitfulness of North Chattanooga! Anyway
> haller[sic] at me and we can go to lunch.
> Vincent Morse CEO
> Perry Development/Deck Masters, Inc./Perry Holmes(sic), LLC

(Tr. Ex. 7, Email dated July 30, 2012, 10:41 a.m.)  Morse referred to commitments from

"both banks" but the email included the first page of only one commitment.  It was dated

July 17, 2012, from Gateway Bank & Trust to Deck Masters, Inc. for a commitment of

$1,283,200 with $300,000 to be used for the development of phase II of Perry Village.

(*Id.*)  The page did not indicate anything about the loan being secured by the lots in Perry

Village. (*Id.* at 2.)

The next email arrived a few minutes later and said, "Take a chance on me. I

won't let you down!!!! :)))." (Tr. Ex. 8.)  Another copy of a note for $100,000 from Deck

Masters and a deed of trust were attached to the email. (*Id.*)

Morse sent a third email a minute later which said only "!!!!!!!!" with a copy of a letter

confirming that Deck Masters had applied to Cornerstone Community Bank for a loan for

$200,000. (Tr. Ex. 6.)  The letter from Cornerstone did not state what project was to be funded

from the loan if it were approved. (*See id.*)  Nor did it state that Cornerstone Bank had committed to make the loan.

Morse continued to press harder and harder until Smith finally told him that he was not interested in investing in Perry North. (Smith Test., November 9, 2015, 10:05:45.)  When Smith told Morse "he was not comfortable getting involved in a project that size," Morse suggested that Smith put up the money to build a house in Perry Village. (*Id.* at 10:06:41.)  Morse told Smith that if he put up $100,000, it would be used to build the house at 902 Geswein Court and that Morse would teach him the "building process." (*Id.* at 10:06:41.)  Morse told Smith that the house would cost $200,000 to build. (*Id.* at 10:10:04.)  Morse never told Smith that he was going to get a construction loan secured by 902 Geswein Court.  Smith testified that Morse did emphasize to Smith that the house could be built faster if Morse did not have to get a construction loan. (*Id.* at 10:10:28; Tr. Ex. 20, Plaintiff's Answers to First Set of Interrogatories 5, no. 9.)  Morse also represented that repayment of Smith's loan was a "sure thing." (*Id.* at 10:11:09.)

The written memorandum of their understanding is entitled "Installment Note with Balloon Payment" ("Note"). (Tr. Ex. 1.)  It is dated August 29, 2012, for the amount of $100,000.  The Note states in part that:

> FOR VALUE RECEIVED, the undersigned promises to pay to the order of JARED SMITH, the sum of ONE HUNDRED THOUSAND Dollars ($100,000.00), PLUS ONE-HALF (1/2) OF THE NET PROCEEDS OF THE SALE OF THE PROPERTY COMMONLY KNOWN AS 902 GESWEIN COURT, 37412. . . .
>
> The net proceeds (the sales price fro[m] the property minus expenses) of the sale shall be the amount of money due to the Seller on a settlement statement for the sale of the property. The settlement statement must be approved by Jared Smith or his assigns. Payment in full must be mailed to Jared Smith or his assigns within three business days of the closing. . . .

If the said property has not been sold within 365 days of the execution of this note, then a balloon payment of $120,000.00 is immediately due and payable from the undersigned to Jared Smith or his assigns to satisfy this note in full.

IT IS FURTHER AGREED that should any one of said installments remain due and unpaid for thirty (30) days, then the remaining installments of this note and interest may be treated as due and payable.

NO DEED OF TRUST, MORTGAGE OR OTHER SECURITY INSTRUMENT IS BEING RECORDED TO SECURE THIS NOTE.

THIS NOTE IS NOT ASSUMABLE WITHOUT WRITTEN PERMISSION OF THE NOTEHOLDER. THERE IS NO PREPAYMENT PENALTY.

. . .

In the event of default under the terms of this note, Interest will accrue to the maximum rate under applicable law.

In the event payments are not received within fifteen (15) days of the due date, a late payment charge of five percent (5%) of principal and interest payment will be assessed.

If this note is placed in the hands of an attorney for collection by suit or otherwise, or to protect the security for its payment We/I will pay all reasonable costs of collection and litigation, together with a reasonable attorney's fee.

(*Id.*)  Mr. and Mrs. Morse also executed the note.  Smith understood that he would receive either repayment of the $100,000 plus one-half of the net proceeds if the house sold, or $120,000 a year later if the house had not sold. (Smith Test., November 9, 2015, 10:17:11.)

### C. The Delivery and Use of the $100,000

At trial, Smith testified that he loaned $100,000 to Deck Masters on August 29, 2013. (*Id.* at 10:09:42.) He stated that he "transferred money from [his] different accounts into [his] personal checking account and [he] wrote Vincent Morse a check." (Tr. Ex. 2.)  Morse complained to Smith that it would take too long for the check to clear, and Morse asked Smith to provide him with two cashier's checks. (Smith Test., November 9, 2015, 10:28:08.) Smith then obtained two cashier's checks dated August 29, 2012, each made out to Deck Masters in the

amount of $50,000. (Tr. Ex. 2.)  He further testified that Morse told him that it would cost

$200,000 to build the home and that Morse "would put up the rest of the money." (Smith Test.,

November 9, 2015, 10:10:04-17.)

Morse deposited the funds into an account at First Volunteer Bank in the name of Deck

Masters, Inc. on August 29, 2016. (Tr. Ex. 22, Summary of Deck Masters, Inc. Account 2.)  On

August 30, Morse moved $30,000 to an account in his name at Gateway Bank & Trust. (Tr. Ex.

23, Summary of Vincent Morse Account1-2.)  Morse also obtained $31,000 in cashier's checks

to pay vendors. (Tr. Ex. 22 at 3.)  On August 31, he used another $8,500 of the Deck Master's

money to pay a vendor for Perry Run. (*Id.*)  The remainder of the funds in the Deck Masters, Inc.

account was spent on other projects and personal expenses. (*See* Tr. Ex. 12, Deck Master's

Ledger.)  The $30,000 placed in the personal account was commingled with other funds and

spent on expenses of Deck Masters and the Morses.  On a "first-in, first-out" basis, the loan

proceeds were spent by the end of October 2012.

### D. The Construction Loan

In addition to the funds obtained from Smith, Morse obtained a construction loan from

First Volunteer Bank for the construction of 902 Geswein on September 10, 2012, only ten days

after the loan from Smith.  The loan was for $172,000 and matured on September 10, 2013. (Tr.

Ex. 15, Construction Loan Agreement.)  Morse maintains that Smith knew of the construction

loan on 902 Geswein.  (V. Morse Test., November 10, 2015, 9:20:17.)  But Morse could not

remember if he ever provided Smith with a copy of the loan approval for the construction loan

on 902 Geswein. (*Id.* at 9:24:13.)  He testified that he informed Smith that the construction cost

of the house was estimated to be $180,000 to $185,000. (*Id.* at 9:31:17.)  The budget estimate

prepared for the house in March of 2012 reflected the cost would be $136,505.51. (Tr. Ex. 11,

Estimate 2.)  Morse testified that the buyer wanted changes that increased the cost. The only

contract provided for the construction of 902 Geswein was dated August 20, 2012 for a sale price

of $215,000 with a completion date of "February 30(sic), 2013." (Tr. Ex. 11, Contract 3-5.)

Although Smith said he was told Morse was providing half of the money, Morse was

approved for $172,000 to construct the house. (V. Morse Test., November 10, 2015, 9:26:41.)

The record reflects that Morse made draws on the bank loan in September for $10,000, which

was deposited into the Deck Masters account, and $18,887.83, which was deposited into his

personal account. (Tr. Ex. 12, Deck Master's Ledger; Tr. Ex. 23, Summary of Vincent Morse

account.)  In October, he drew an additional $22,903.79, which was deposited into his individual

account. (Tr. Ex. 23 at 15.)  The Deck Masters' account reflects an additional draw on October

29 for $5,367.95 (Tr. Ex. 12 at 9.)  The last two draws shown on the ledger were made in

November and total $5,337.95. (*Id.*)  There were no records offered at trial related to 2013, the

year the Debtors filed bankruptcy.

Construction on the residence at 902 Geswein Court slowed in November of 2012. Smith

approached Morse about the problem in December and Morse offered to discuss the matter over

dinner. (Smith Test., November 9, 2015, 10:35:38.)  Smith testified that he could get no

explanation about the Geswein house from Morse. All Morse wanted to talk about was Smith

making an investment in Perry North. (*Id.*)  Morse did not complete the house, and it was

ultimately foreclosed by Volunteer Bank. (V. Morse Test., November 10, 2015, 9:39:40.)

### E. The Misrepresentations

Smith contends that Morse deliberately lied to him about his intentions regarding the

$100,000 and the construction of the residence at 902 Geswein Court.  Morse's testimony differs

from Smith's in two significant respects.  He maintains that Smith knew the loan proceeds were

not intended for one particular house but were meant as an investment in Deck Masters. (V. Morse Test., November 9, 2015, 4:21:06; V. Morse Test., November 10, 2015, 9:06:57.)  He also maintains that Smith knew about the construction loan on 902 Geswein. (V. Morse Test., November 10, 2015, 9:20:17.)  The court does not find Morse credible on either of these points.

Morse admitted that he informed Smith in 2011 that business was booming when, in fact, Deck Masters had been operating with a negative cash flow since 2008. (V. Morse Test., November 9, 2015, 2:52:49 – 55:07.)  He further admitted that Smith declined to provide $100,000 for the Perry North development and refused to sign the contract Morse had drawn up. (*Id.* at 2:14:30.)  Morse did not know why Smith rejected the contract on Perry North, but he testified that they discussed several other developments and ultimately executed a note for Perry Village, specifically lot 9 (902 Geswein). (*Id.* at 2:16:18.)

Morse's contention that the money was an investment into Deck Masters and not specifically for the construction of 902 Geswein is not supported by his own testimony.  He admitted to telling Smith that the house at Geswein was "pretty well sold" and that it was a sure thing. (V. Morse Test., November 10, 2015, 9:13:03.)  He testified that Smith was not comfortable with investing in Perry North.  Despite admitting to this discussion, Morse testified that Smith was comfortable investing in Deck Masters knowing that the money would be used for any projects Deck Masters was involved with, including Perry North. (*See id.* at 9:07:56.) The court does not find this to be logical or credible, especially in light of Morse's testimony that he told Smith that his money was going to be used to build a house and that the lot he showed Smith was at 902 Geswein. (*Id.* at 9:14:17.)  Smith also testified that Morse introduced him to others in Morse's office as the person who was putting up the money for [the buyer's] house. (Smith Test., November 9, 2015, 10:30:26.)  The identification of Smith as the lender for 902

10

Geswein was corroborated by the testimony of Joseph Ingram. (Testimony of Joseph Ingram, November 9, 2015, 9:11:24.)  The return on the Note was also tied to the sale of the house and its costs and sales price.  Morse also admitted that the contract called for Smith to be repaid based on the net proceeds from 902 Geswein. (*Id.* at 11:09:42.) The court finds that Morse represented that the receipt of the $100,000 was a loan to build a specific house and not an investment in Deck Masters generally.

The second misrepresentation is one of failing to disclose a material fact, specifically Morse intended to place a lien for the entire construction cost against the property.  Morse relies on a reference in the Note to a settlement statement as the basis for his claim Smith knew about the loan. (Tr. Ex. 1, Note.)  While questioning Smith, Morse's counsel offered an interpretation of the Note under which net proceeds were only what was left after the payment of the construction loan, the expenses of the sale, and the taxes. (Smith Test., November 9, 2015, 11:36:31.)  Because the settlement statement usually has an amount to pay the construction lender, Smith should have known there was such a lender other than him.

The court does not find that the anticipation of a settlement statement at closing was evidence of knowledge that a construction loan for almost the entire cost of the house would be obtained by Morse.  A settlement statement would have been completed if Morse had only borrowed his half of the construction costs or if the buyer was obtaining a loan for the purchase.  Further, the calculation described in the Note is "sales price minus expenses," not "loan(s) pay off."  Leaving the money in the company appears to be what Morse needed but not what he led Smith to believe was their deal. The court finds nothing in the Note or in any other party's testimony to support Morse's contention

that he represented to Smith that he was making an investment in Deck Masters and was unlikely to have his loan repaid upon the sale of the house.

With respect to the Note's promise of a return based on the expenses, the court questions whether Morse could have even determined the actual expense of building the house in order to calculate what the net proceeds were.  Morse's record keeping would have made calculating the net proceeds very difficult.  Morse testified that he would receive invoices and throw them into a box, and that he had no idea how vendors were applying his payments. (V. Morse Test., November 9, 2015, 2:08:12.)  He would update his QuickBooks records once a year by using his check ledger, but he admitted that he would not consult the invoices to determine what should be applied where. (*See id.* at 2:06:32.)  The bank statements offered at trial show very few payments related to 902 Geswein.  The Deck Masters ledger references that the account related to the payments was "Construction in progress." (Tr. Ex. 12.)  Once a year the information was sorted through for taxes and allocated to the various projects.  If 902 Geswein had been completed and sold in February of 2013, it is unlikely Morse could have determined what his actual cost was until the following year when the 2013 taxes were prepared.

Neither party offered any proof on why construction of the house was abandoned in late 2012 or early 2013. There was no accounting for when the last construction draw was taken or how the draws were used. There were no details regarding the foreclosure or the sale price at the foreclosure.

### III.    Analysis

#### A.    The Debt

Smith has requested a judgment for $100,000 for the principal amount loaned, the attorney's fees incurred attempting to collect it, and the $20,000 in interest he was to receive if the house was not sold by August 28, 2013, based on the language in the Note.

Regarding attorney's fees, the court must look to Tennessee state law to determine if Smith is entitled to such an award.

> Tennessee, like most jurisdictions, adheres to the 'American rule' for award of attorney fees. *John Kohl & Co. v. Dearborn & Ewing,* 977 S.W.2d 528, 534 (Tenn. 1998); *Pullman Standard, Inc. v. Abex Corp.,* 693 S.W.2d 336, 338 (Tenn. 1985). Under the American rule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case. *Taylor v. Fezell,* 158 S.W.3d 352, 359 (Tenn. 2005); *John Kohl,* 977 S.W.2d at 534.

*House v. Estate of Edmondson,* 245 S.W.3d 372, 377 (Tenn. 2008) (citations omitted).  In this case, the Note provides:

> If this note is placed in the hands of an attorney for collection by suit or otherwise, or to protect the security for its payment We/I will pay all reasonable costs of collection and litigation, together with a reasonable attorney's fee.

(Tr. Ex. 1, Note.)  Because there is a specific contractual provision that creates the right to attorney's fees, the court finds that Smith is entitled to an award of his attorney fees under Tennessee law.

Regarding the $20,000 in interest to which Smith claims the Note entitles him, a more detailed analysis is required for several reasons.  First, the Note was contingent in nature; Smith was not to receive the $20,000 if the house sold within the one year period.  Instead, the Morses and Deck Masters promised to pay $100,000 plus one-half of the net proceeds of the sale of 902 Geswein Court. (Tr. Ex. 1.)  Such proceeds might have amounted to a payment to Smith of much

less than the $20,000 he now seeks.  In fact, there was testimony that the house was foreclosed

upon by the bank.  The court was not made aware of when this occurred or what the terms of the

foreclosure sale were, but given that most foreclosure sales of this nature do not generate

proceeds above what is owed to the bank[3], the court notes that if the sale had occurred before the

one year period had expired, Smith might have received no interest under his note.[4]

Second, because the $20,000 did not become due until August 29, 2013, two months after

the Morses filed for bankruptcy on June 28th, the court finds that even if ultimately owed, the

$20,000 represents an obligation that had not matured at the date of filing.  Creditors are not

entitled to make a claim for unmatured interest. 11 U.S.C. 502(b)(2).  Had the Note not been

contingent and simply called for Smith to be paid an annual 20% interest, then Smith might have

had a claim for a prorated share of such interest.  However, the Note did not contemplate any of

the 20% becoming due until the house failed to sale within a year.  Because the Morses filed

bankruptcy before the end of that period, Smith's interest in the 20% had not matured as of the

date of filing, and thus he is not entitled to the $20,000.[5]

Having found that the debt owed by Mr. and Mrs. Morse is $100,000 plus reasonable

attorney fees and costs, the court must determine whether all or any part of the debt is not

dischargeable.

---

[3] There was testimony that established that both parties understood that the house would cost approximately
$180,000 to construct.  No matter the source of the remaining construction funds, under his theory of the Note,
Smith would not have collected a cent over his principal if the house sold for $180,000 or less within one year
because there would have been no net proceeds after paying the expenses.

[4] Smith could argue that there was not supposed to be a construction loan on the property, so there should not have
been a foreclosure sale.  However, the court is not prepared to rule on this issue because neither party has raised it.
The court is merely pointing out that the $20,000 Smith is seeking was contingent and that events may have
occurred before the bankruptcy was filed that would have terminated Smith's right to the $20,000.

[5] *See infra* B.1 (finding the appropriate award of damages in Tennessee in cases involving fraud does not include
expectation damages, meaning that even if Smith had a claim for the $20,000, it would still be dischargeable).

### B.    The Plaintiff's Section 523(a) Claims against Mr. Morse

11 U.S.C. § 727 provides for the discharge of an individual from any specific debt unless that debt is excepted from discharge pursuant to 11 U.S.C. § 523. 11 U.S.C. § 727(a)-(b).  The creditor must prove by a preponderance of the evidence that its debt is non-dischargeable under 11 U.S.C. § 523. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659 (1991). Exceptions to discharge are narrowly construed in the debtor's favor. *See Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004).

### 1.    Section 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) prohibits discharges of debt based on "(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." The Sixth Circuit has held that to demonstrate nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A), a creditor must prove four elements:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). A creditor bears the burden of demonstrating these elements by a preponderance of the evidence. *Id.* at 281 (relying on *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661).

> The first prong of the *Rembert* test has three basic elements that must be satisfied: (1) the debtor received money; (2) that was procured through material misrepresentations by the debtor to the creditor; and (3) at the time the debtor made the representations, he either knew that they were erroneous, or he was reckless in failing to determine their veracity.

*In re Copeland*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003)

The first question is whether Morse or Deck Masters received the $100,000. There is no dispute that Deck Masters initially received the $100,000 from Smith and that $30,000 of it went immediately to Morse's account.  The evidence showed that Morse used his company account and his personal account without regard to whose expenses were being paid from which account.  The $70,000 that remained in the Deck Masters account was used primarily to pay vendors on other projects and, based on a "first in/first out" accounting of the funds that went into the account, the loan proceeds were spent by mid-October 2012. The court can find only a few checks in the copies of checks from the two accounts that even reference "902" or "902 GW" in September and October of 2013. (Tr. Ex. 22 & 23.)  The court must determine whether uses of the loan proceeds in the Deck Masters account are sufficient to meet the prong requiring that the debtor receive the money.  Under the circumstances of this case, the court finds that it does.

> It is not necessary that a debtor personally receives money from the creditor in order to satisfy the first element. "The court does not require that the debtor directly and personally receive every dollar lost by the creditor." *Metcalfe v. Waters (In re Waters),* 239 B.R. 893, 902 (Bankr. W.D. Tenn. 1999) (citing *761 Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1172 (6th Cir. 1996); *HSSM # 7 Ltd. P'ship v. Bilzerian (In re Bilzerian),* 100 F.3d 886, 890 (11th Cir. 1996); *Luce v. First Equip. Leasing Corp. (Matter of Luce),* 960 F.2d 1277, 1283 (5th Cir. 1992)); *see also Ashley v. Church (In re Ashley),* 903 F.2d 599, 604 (9th Cir. 1990). Instead, "if the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable." *Waters,* 239 B.R. at 901 (quoting *Bates v. Winfree (In re Winfree),* 34 B.R. 879, 883 (Bankr. M.D. Tenn. 1983)).

*In re Copeland*, 291 B.R. 740, 760-61 (Bankr. E.D. Tenn. 2003). In this case, Morse used the loan proceeds to keep his company and the Perry North project going. On the day after he deposited the money into the account, he paid $8,500 for the Perry Run sidewalks, $20,000 to a lumber company, and $10,000 to a concrete company. Morse testified that he would just pay lump sums to the vendors to apply to their accounts so that he could incur additional debt for

16

materials. Rather than the successful business he had described to Smith, he appears to have been behind with his vendors and experiencing cash flow problems.

The benefit to Morse is even more direct when the court considers the payments made from the Deck Masters account. The cash ledger for Deck Masters reflects "personal distributions" for groceries, vehicle expenses, meals, and water bills. (Tr. Ex. 11, Deck Masters Ledger 9-11.)  The funds were commingled.  The determination of what payments went to what projects was done substantially after the expense was incurred and only for tax purposes.  At trial, there were no corporate records available for review and no accounts for 2013 offered. Mrs. Morse testified that she kept no minutes as the corporate secretary.  The court finds the benefits to Morse and his closely held company are sufficient to meet the first prong.

As to the second prong, the court finds that Smith has demonstrated that those funds were obtained through material misrepresentations.  Smith testified that after he rejected Morse's offers to invest in Perry North, Morse offered an opportunity to him to loan money to build a specific house. Morse represented that he would provide the other half of the money to build the house.  Morse represented to him that their combined $200,000 would be sufficient to build 902 Geswein and that construction would be faster without a construction loan.  Morse did not tell Smith that, despite his representations about the efficiency of construction without a construction loan, Morse was planning to obtain a construction loan for almost the entire cost of the construction.  Morse also represented that Smith's funds would be repaid when the house was sold.  He further represented that selling the house was not a problem because it was already under contract.  It was a "sure thing" and the parties would split the net proceeds.

Morse denies that he ever told the Plaintiff that his funds would be used to build the house at 902 Geswein. He claims that Smith wanted to learn the building business and to do so, Smith made an investment in Morse's business, Deck Masters. For the reasons stated in section II.E, the court does not find Morse's version of the facts credible.

Smith testified to numerous discussions with Morse about business opportunities which Smith turned down.  Morse does not dispute these discussions or Smith's refusal to be involved in Morse's development of Perry North.  The court finds that when Morse was unable to obtain funds from Smith for this purpose, he took another approach to entice Smith to provide funds to his troubled business.

The court finds that Morse made representations to Smith about how his money would be used, how the construction of the house would be paid for, and how he would receive his return.  He also represented that because of the existence of the sales contract, the investment was a "sure thing."  These representations were material and false.

As to the last prong, the court finds that Morse knew that these statements were false.  The construction loan is evidence that Morse never intended to split the cost of the construction.  He did not borrow merely his half.  He borrowed almost the entire cost and used Smith's money to pay expenses of other developments in which Smith had refused to invest.

In addition to finding that there were false representations made, the court must also find that Morse intended to deceive Smith.  "Whether a debtor possessed an intent to defraud a creditor within the scope of section 523(a)(2)(A) is measured by a subjective standard. *In re Rembert*, 141 F.3d at 281 (citing *Field v. Mans*, 516 U.S. 59, 70-72, 116 S.Ct. 437, 444 (1995)). Intent to deceive a creditor exists " 'when the debtor makes a false representation which the

debtor knows or should have known would induce another to advance goods or services to the debtor.' " *In re Copeland*, 291 B.R. 740, 765-66 (Bankr. E.D. Tenn. 2003) (quoting *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001)).  "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *In re Rembert,* 141 F.3d at 282 (quoting *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334 (Bankr. N.D. Ill. 1995)).  The intent may be inferred from the totality of the circumstances. *In re Copeland*, 291 B.R. at 766.

The court finds that Morse's intent may be inferred from his actions.  He first gave Smith the impression that his business was doing well.  He maintained the trappings of a successful businessman.  He tried to obtain the funds for the subdivision that was short of capital and when rejected, he led Smith to believe that his funds would be used for a smaller, less risky endeavor.  Once those funds were obtained, he immediately proceeded to use them in the manner he wanted in complete disregard of his representations to Smith.  When Smith approached him about his concerns, he diverted Smith from the progress on 902 Geswein and asked again for more money for Perry North.  Progress on the house slowed, effectively delaying the sale date as well as the deadline to disburse proceeds.  Throughout this process, Morse failed to disclose the existence of the $172,000 construction loan and what draws had been taken from it.  His financial problems mounted and bankruptcy followed before the note's maturity date.  The court finds that these circumstances evidence fraudulent intent.

To object successfully to the dischargeability of a debt, the plaintiff must also show that he justifiably relied on the representations.  Morse challenges Smith's reliance on any such representations that the sale of 902 Geswein would ensure repayment of

Smith's loan. He relies on the language in the Note that there would be no deed of trust recorded for Smith's loan. Smith admitted that he knew what a deed of trust was, had signed several of them for his car washes, and had turned down deeds of trust on property in Perry North. From those admissions, Morse argues that Smith's reliance on any oral statements regarding the sales proceeds serving as a "sure thing" is not reasonable in light of Smith's knowledge that there was no collateral for the Note. However, if Morse had contributed half of the proceeds for the cost of construction and applied Smith's $100,000 to the construction of the house, and finished the house by February of 2013, Smith's understanding of the deal would have been realized.

Further, the court does not find Morse's contention to accurately represent what Smith was relying on. Smith's contention is not that Morse failed to given him collateral, but rather that Morse would move forward with the construction and that the only other claim to those proceeds would be reimbursement for the expenses of that home's construction. Morse obtained a lien against the entire project and even diverted some of those proceeds to other projects. The court finds that Smith's reliance was justified.

The final element is whether that reliance is the proximate cause of the loss. The court finds that it was. Smith rejected offers to invest in the Perry North development even with specific lots as collateral. He accepted the offer to become involved in the construction of a specific house about which Morse made specific representations about its construction. Morse also concealed an important fact about the financing of his portion. Morse obtained Smith's loan by false pretenses and Smith suffered the loss of $100,000. The court finds that Smith has carried his burden of proof that the $100,000 was obtained by fraud. Consequently, that debt is nondischargeable.

20

Smith also requests that the nondischargeable debt include the $20,000 in interest promised in the Note and his attorney's fees. The court has already determined that Smith is not entitled to the $20,000 in interest.

As for the attorney's fees, in *Cohen v. de la Cruz*, the U.S. Supreme Court held that attorney's fees and treble damages could be awarded in a Section 523 nondischargeability claim, if such damages were supported by an underlying state law. 523 U.S. 213, 223, 118 S. Ct. 1212, 1219 (1998). However, as one bankruptcy court explained, "it is clear that *Cohen* does not itself create an independent right to attorney's fees for the benefit of a party who prevails in a Section 523 dischargeability proceeding. Instead, it clarifies that attorney's fees supported by statute are included in the debt that may be determined to be non-dischargeable." *Headrick v. Atchison (In re Atchison)*, 255 B.R. 790, 793 (Bankr. M.D. Fla. 2000) (citing *Cohen*, 523 U.S. 213). Thus, a plaintiff is not entitled to attorney's fees merely because of success on a nondischargeability claim.

Where there is no specific statute or contractual right to attorney's fees, Tennessee law follows the American rule pertaining to the award of attorney's fees with only a few limited exceptions. *See Pullman Standard, Inc. v. Abex Corporation*, 693 S.W.2d 336 (Tenn. 1985). In *Pullman*, the Tennessee Supreme Court noted that "[w]e continue to adhere to the rule in Tennessee that attorneys' fees are not recoverable in the absence of a statute or contract specifically providing for such recovery, or a recognized ground of equity. . . ." *Id.* at 338.

Here, the right to attorney's fees is a contractual provision in the Note and those fees would be allowed to be recovered for the collection of the debt under Tennessee law as discussed in section III.A above. The court finds that the inclusion of these fees is necessary to put Smith back into the position he would have been in had the fraud never

21

been committed.  In Tennessee, "where a party is injured by fraud, he 'should be compensated for the actual injuries sustained by placing him or her in the same position he or she would have been had the fraud not occurred.' " *Ray v. Williams*, 2002 Tenn. App. LEXIS 345, *15 (Tenn. Ct. App. 2002) (quoting *Harrogate Corp. v. Sys. Sales Corp.*, 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995)); *see Shahrdar v. Global. Hous., Inc.*, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998) (citing *Blasingame v. American Materials, Inc.*,  654 S.W.2d 659, 665 (Tenn. 1983)).  The court will also hold that the attorney's fees are nondischargeable.  The amount of these fees will be determined at a separate hearing.

## 2.    Section 523(a)(4)

11 U.S.C. § 523(a)(4) states in relevant part: "A discharge under section . . . 727 of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. . . ." 11 U.S.C. § 523(a)(4).  Federal common law determines the meaning of the terms in Section 523(a)(4). *See SmithKline Beecham Corp. v. Lam (In re Lam)*, No. 06-68805-MGD, 2008 WL 7842072, at *3 (Bankr. N.D. Ga. Mar. 27, 2008) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901 (7th Cir. 1991); *In re Wallace*, 840 F.2d 762 (10th Cir. 1988)) (other citations omitted).  The creditor must prove by a preponderance of the evidence that a debt is nondischargeable under 11 U.S.C. § 523.  *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654, 659 (1991).

The Sixth Circuit has explained that:

[f]ederal law defines "embezzlement" under section 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996), *abrogated on other grounds as explained in National Devel. Servs. v. Denbleyker (In re Denbleyker)*, 251 B.R. 891 (Bankr. D. Colo. 2000) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982) and *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295 (1895)) and (citing *Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)).  To demonstrate embezzlement a creditor must prove all three elements: "(1) 'that he entrusted his property to the debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) that 'the circumstances indicate fraud.' " *Cash America Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007) (quoting *In re Brady*, 101 F.3d at 1173).  In this case, the funds were not "entrusted" to Morse in the sense that the funds retained their character as Smith's property.  They were loan proceeds and Smith's interest, as a result of loaning those funds, was changed from an ownership interest to a right to repayment from the Debtors from any source.  Smith has failed to demonstrate that the funds provided to Morse remained as his property or remained subject to restrictions as to their use after the loan was made.  Having failed to meet the first prong, the court does not find that Smith has demonstrated that his debt was the result of embezzlement.

###   3.       Section 523(a)(6)

11 U.S.C. § 523(a)(6) states in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity. . . .

11 U.S.C. § 523(a)(6).

23

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by analyzing federal law. *See, e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01 (Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388 (Bankr. N.D. Ohio 1999)).  11 U.S.C. § 523(a)(6) provides that a debt arising from an injury that is *both* willful *and* malicious is nondischargeable. *See* 11 U.S.C. § 523(a)(6).  "[T]he judgment must be for an injury that is both willful and malicious.  The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999).  The U.S. Supreme Court has addressed the meaning of "willful" within the context of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998).  As summarized by the Sixth Circuit:

> [t]he Court held that "willful" means "voluntary," "intentional," or "deliberate."
> As such, only acts done with the intent to cause injury – and not merely acts done
> intentionally – can cause willful and malicious injury. The Court explained its
> holding by discussing the importance of context:
>
>> The word "willful" in (a)(6) modifies the word "injury," indicating
>> that nondischargeability takes a deliberate or intentional *injury*, not
>> merely a deliberate or intentional act that leads to injury. Had
>> Congress meant to exempt debts resulting from unintentionally
>> inflicted injuries, it might have described instead "willful acts that
>> cause injury." Or, Congress might have selected an additional
>> word or words, i.e., "reckless" or "negligent," to modify "injury."
>> Moreover, as the Eighth Circuit observed, the (a)(6) formulation
>> triggers in the lawyer's mind the category "intentional torts," as
>> distinguished from negligent or reckless torts. Intentional torts
>> generally require that the actor intend "the *consequences* of an
>> act," not simply "the act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are

substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464.  Proof of willful behavior must often be demonstrated through the use of circumstantial evidence. *See In re Jones*, 276 B.R. at 802.  The bankruptcy court in *In re Jones* noted that "willful" behavior can "be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Id.*

As to the element of malice, a malicious injury occurs "when a person acts in conscious disregard of their duties or without just cause or excuse." *In re Jones*, 276 B.R. at 803 (citing *Gonzalez v. Moffitt (In re Moffitt),* 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)).  A finding of maliciousness does not require a determination of ill-will or specific intent. *See In re Trantham*, 304 B.R. at 308.  However, malice requires the finding of a level of conduct beyond negligent or reckless behavior. *West Mich. Cmty. Bank v. Wierenga (In re Wierenga)*, 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010) (citation omitted); *see also, JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010); *Geiger*, 523 U.S. at 64, 118 S.Ct. 974.  A creditor may prove the element of maliciousness by demonstrating that "(1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *In re Algire*, 430 B.R. at 823 (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991), *abrogated on other grounds by Geiger*, 523 U.S. 57).

In *National Sign and Signal v. Livingston*, the district court explained that the § 523(a)(6) exception applies where the injury invades a creditor's legal rights. 422 B.R. 645, 653 (W.D.

25

Mich. 2009) (citing *Steier v. Best (In re Best)*, 109 F. App'x 1, 6 (6th Cir. 2004)).  The district

court quoted the Sixth Circuit decision in *In re Best*, noting:

> Section 523(a)(6)'s term "willful . . . means deliberate or intentional invasion of
> the legal rights of another, because the word 'injury' usually connotes legal injury
> (*injuria*) in the technical sense, not simply harm to a person." The conduct "must
> be more culpable than that which is in reckless disregard of creditors' economic
> interests and expectancies, as distinguished from . . . legal rights. Moreover,
> knowledge that legal rights are being violated is insufficient to establish
> malice. . . ."

*Livingston*, 422 B.R. at 653 (quoting *In re Best*, 109 F. App'x at 6).  The court in *Livingston*

noted that there are three elements that a creditor must demonstrate to state a claim under §

523(a)(6): "(1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its

legal rights or to the legal rights to its property, and (3) the invasion was caused by the debtor's

conduct." 422 B.R. at 653 (citing *CMEA Title Agency v. Little* (*In re Little*), 335 B.R. 376, 383

(Bankr. N.D. Ohio 2005)).  In this case, the acts alleged are the use of the money for purposes

other than to build 902 Geswein.  In order to be successful, Smith must show that he had a legal

right to require that the money be used for that sole purpose.  The court finds nothing in the Note

that limits the use of the funds for that purpose.  Although Morse's using the proceeds for

himself and his company rather than to build the house is important to the court's determination

that Morse's representations were false and his intent in making those misrepresentations

fraudulent, those acts alone are not sufficient to create a legal obligation whose violation may be

the basis of a successful claim for willful and malicious injury. The court denies Smith's claim

that his debt was the result of a malicious and willful injury inflicted by the debtor.

## C.    The Plaintiff's Section 727 Denial of Discharge Claims

11 U.S.C. § 727 provides that a debtor shall receive a discharge of all his debts, except in

certain limited circumstances.  The Plaintiff asserts that several of those exceptions to the right of

discharge apply to Mr. and Mrs. Morse.  A plaintiff must prove the elements of 11 U.S.C. §

727(a) by a preponderance of the evidence, and courts generally construe Section 727(a) liberally

in favor of the debtor. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *see

also, Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 373 (Bankr. E.D. Tenn. 2009).

### 1.    Section 727(a)(3)

The first objection is based on 11 U.S.C. § 727(a)(3). It precludes a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of the
> circumstances of the case.

11 U.S.C. § 727(a)(3).

Although exceptions to discharge are narrowly construed in the debtor's favor, " '(b)road

discretion is vested in the referee to grant or deny a bankruptcy petition based on a determination

that books or records are adequate under the terms of the statute and the facts of each case. . . .' "

*Dolin v. Northern Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986) (quoting

*McBee v. Sliman*, 512 F.2d 504, 506 (5th Cir. 1975)); *see also In re Trantham*, 304 B.R. at 306;

*CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007)

("statute is to be liberally construed in favor of the Debtor").  In this case, Smith's objection is

specifically related to the Morses' accounting for the $100,000.

Courts in this Circuit have interpreted 11 U.S.C. § 727(a)(3) "to apply a shifting burden

of proof":

> The Plaintiff must establish a *prima facie* case showing the Debtor failed
> to keep adequate records. For purposes of § 727(a)(3), the Plaintiff is not entitled
> to perfect, or even necessarily complete, records. Instead, the Debtor must provide
> the Plaintiff "with enough information to ascertain the debtor's financial condition

and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." In determining the adequacy of records, the court can consider the Debtor's education, business experience, sophistication, or any other relevant factor.

If the Plaintiff has established this *prima facie* case, the burden then shifts to the Debtor to explain why the failure to keep records, under the circumstances of the case, is justified. In considering an explanation, the court should consider both the Debtor's credibility and the reasonableness of the explanation, considering the debtor's sophistication and the materiality of the records. The requirement for keeping recorded information is not an unqualified one and complete disclosure is not always required, but instead it is a question of reasonableness under the circumstances. However, if disclosure cannot be made without the keeping of recorded information, the failure to supply the records is relevant to the policy underlying § 727(a)(3).

The ultimate burden of persuasion, of course, rests with the Plaintiff. The standard of proof for discharge objections under § 727(a) is by a preponderance of the evidence.

*CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415-16 (Bankr. S.D. Ohio 2007) (quoting *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999)) (other citations omitted).  In addition, " '[t]he adequacy of debtor's records must be determined on a case by case basis.  Considerations to make this determination include debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice.' " *In re Strbac*, 235 B.R. at 882 (quoting *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)).  Further, "intent is not an element under § 727(a)(3)." *See Hendon v. Lufkin (In re Lufkin)*, 393 B.R. 585, 593 (Bankr. E.D. Tenn. 2008).  Bankruptcy courts in this Circuit have created a standard for assessing the adequacy of recordkeeping that recommends that "the Debtor's records should be measured 'against the type of books and records kept by a reasonably prudent debtor with the same occupation, financial structure, education, and experience.' " *Ayers v. Babb*

*(In re Babb)*, 358 B.R. 343, 354 (Bankr. E.D. Tenn. 2006) (quoting *Wazeter v. Michigan Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997) (internal quotation omitted)).

In support of this claim, Smith contends that the Morses have been unable to explain how Morse spent the $100,000 of loan proceeds. Smith's counsel questioned Morse at length regarding his prior deposition testimony that he could not explain where the money had been spent. In his depositions, he testified that he maintained the books and records of his company with the help of an accountant in North Carolina. (Tr. Ex. 16, Deposition of V. Morse 5.) He claimed he kept a ledger for each house beginning in 2011. (*Id.* at 10.) He paid vendors in cash. (*Id.* at 13.) He "ran a tab" with other vendors. (*Id.* at 38.) He did not look at the invoices. He threw them in a box and could not trace how he spent Smith's money but that he used it to pay bills. (*Id.* at 149 ln. 10 to 150 ln. 2, and 150 ln. 19-25, and 151 ln. 1-2.)

At trial, Morse changed his testimony to describe his accounting practices as simply keeping all the records and making general entries in his accounts with the help of his assistant and his project manager. He also used a bookkeeper in North Carolina, who had passed away, to prepare his tax returns. He admitted that only when he was preparing his tax returns were specific payments allocated to specific jobs. (V. Morse Test., November 9, 2015 2:49:29.) At trial, he testified that, using a "first-in, first-out" basis, he had spent all of Smith's money within a few weeks. While this proof supports a finding that Morse's record keeping was sloppy, it was sufficient to show that Morse almost immediately ran through Smith's money to pay for other business and personal expenses.

The evidence demonstrated that Morse provided himself with a $30,000 cashier's check immediately following the deposit of Smith's funds into the Deck Masters account. (Trial Ex. 22.) One of the exhibits showed the transfers out of the two accounts which Morse used without

any regard for whether an item being paid was a business or personal item. His testimony at trial was more complete than his deposition testimony about how the bookkeeping was handled, and described very poor record keeping habits. Nevertheless, the court finds that the Debtor's testimony combined with the ledger pages and bank statements presented at trial were sufficient to show how the funds provided by Smith to Deck Masters and Morse were spent. Having found that there were sufficient records to account for the $100,000, the court will overrule the objection to Mr. and Mrs. Morse's discharge on the basis that the Debtors failed to keep records from which their financial condition could be determined.

## 2.   Section 11 U.S.C. § 727(a)(4)(A)

The Bankruptcy Code provides that a debtor shall receive a discharge from the court unless "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account. . . ." 11 U.S.C. § 727(a)(4)(A). Courts in this circuit have determined that to state a claim pursuant to § 727(a)(4)(A), a plaintiff must demonstrate by a preponderance of the evidence the following five elements:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) that the statement related materially to the bankruptcy case.

*Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 903 (Bankr. W.D. Tenn. 2009) (citing *In re Keeney*, 227 F.3d at 685).

Morse was asked at his first meeting of creditors what was the purpose of the Smith loan. Morse stated it was to obtain funds for his company. Statements made by a debtor in his bankruptcy schedules, his personal statement of financial affairs, and at 341 meetings are all statements made under oath. *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999))

30

(other citations omitted).  Whether a false statement under oath has been made pursuant to 11

U.S.C. § 727(a)(4)(A) is a question of fact. *In re Jarrett*, 417 B.R. at 903.

Morse's statement that the purpose of the loan was for his company appears to be the

truth based on what Morse's intentions were with respect to the loan and how he made use of the

proceeds.  The court has found there were false representations made about Morse's intentions

for the $100,000 at the time Morse induced Smith to make the loan, but the court does not find

that Morse made a false statement at the 341 meeting.

In *In re Hamo*, the Bankruptcy Appellate Panel for the Sixth Circuit quoted a bankruptcy

court regarding the purpose of § 727(a)(4)(A):

> The very purpose of . . . 11 U.S.C. § 727(a)(4)(A), is to make certain that those
> who seek the shelter of the bankruptcy code do not play fast and loose with their
> assets or with the reality of their affairs. The statutes are designed to insure that
> complete, truthful, and reliable information is put forward at the outset of the
> proceedings, so that decisions can be made by the parties in interest based on fact
> rather than fiction . . . . Neither the trustee nor the creditors should be required to
> engage in a laborious tug-of-war to drag the simple truth into the glare of
> daylight.
>
> . . . .
>
> A discharge is a privilege and not a right and therefore the strict requirement of
> accuracy is a small quid pro quo. The successful functioning of the bankruptcy
> code hinges upon the bankrupt's veracity and his willingness to make a full
> disclosure.

233 B.R. at 725-726 (quoting *Hillis v. Martin, Martin v. Martin (In re Martin)*, 124 B.R. 542,

545, 547-48 (Bankr. N.D. Ind. 1991)).

The court does not find that Morse attempted to obscure from his trustee or his creditors

post-petition his intentions with respect to the loan.  Smith has failed to demonstrate the elements

for denial of Morse's discharge under 11 U.S.C. § 727(a)(4)(A).

### 3.    Section 727(a)(5)

Section 727(a)(5) allows a court to deny a discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).  With respect to a Section 727(a)(5) claim:

> [t]he initial burden is on the Plaintiff to establish the loss or deficiency of assets by demonstrating that (1) at a time not too remote from the bankruptcy, the Defendant owned identifiable assets; (2) on the day that he commenced his bankruptcy case, the Defendant no longer owned the particular assets in question; and (3) his schedules and/or the pleadings in the bankruptcy case do not offer an adequate explanation for the disposition of the assets in question. The Plaintiff is not required to prove that the Defendant acted knowingly or fraudulently, as "noticeably lacking from § 727(a)(5) is any element of wrongful intent or, for that matter, any affirmative defenses-- § 727(a)(5) simply imposes strict liability."

*Roberts v. Debusk (In re Debusk)*, No. 08-3015, 2008 WL 3904448, at *8 (Bankr. E.D. Tenn. Aug. 19, 2008) (citing *Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 279 (Bankr. W.D. Ky. 1999) and quoting *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004)).

As noted *supra* with respect to his Section 727(a)(3) claim, Smith has alleged that Morse had $100,000 in August of 2013 which was received as the proceeds of the Smith loan.  Smith's objection does not relate to the loss or deficiency of any other asset; his objection relates only to his loan proceeds.  Based on the evidence presented at trial, the money was gone when the case was filed and there was no equity in 902 Geswein.  As previously discussed, the Morses have explained the loss of the $100,000 through the Deck Masters and Personal Account bank statements and the summary provided at trial. (Trial Ex. 22 and 23.)  Therefore, the court concludes that Smith has not demonstrated the elements necessary for a denial of their discharge on the basis of the loss of assets.

### V.      Conclusion

The court has found that Morse made false representations about the success of his business, his intention to build the house at 902 Geswein in an expedited manner with Smith's money, and his intention to provide half of the money for the construction.  Morse concealed that he obtained a construction loan for almost the entire cost of the construction and pledged the house as collateral for his loan.  The circumstances indicate Morse needed cash, he knew exactly how he was going to spend the funds once he obtained them, and he did not intend to use the funds to construct 902 Geswein.  The Note and the discussion of 902 Geswein was a subterfuge to obtain an infusion of working capital for projects in which Smith had previously refused to invest.  All of these circumstances indicate fraudulent intent.  Smith relied on those representations and lost $100,000 as a result of Morse's misrepresentations. The court finds $100,000 of the debt owed to Smith by Morse was obtained by fraud and false pretenses and is not dischargeable.

With respect to the other grounds for denial of the dischargeability of the debt, the court finds that Smith has not proven the necessary elements.  The court also finds that Smith has not carried his burden of proof with respect to the objections to the discharge of Mr. and Mrs. Morse.

The court will enter a judgment against Mr. and Mrs. Morse in the amount of $100,000 plus an amount for reasonable attorney's fees and costs of collection.  That amount of fees and expenses will be determined following a further hearing.  The judgment will be nondischargeable only as to Mr. Morse. The entire amount will be dischargeable as to Mrs. Morse.

A separate order will enter.

# # #